**ECHO, INC., Petitioner,**

v.

**David R. HINSON, Administrator,
Federal Aviation Administration,
Respondent.**

No. 94–1627.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1994.

Decided Feb. 9, 1995.

James G. Goggin with whom Carl E. Kandutsch, Portland, ME, was on brief, for petitioner.

James W. Tegtmeier with whom Kathleen A. Yodice, Washington, DC, was on brief, for respondent.

COFFIN, Senior Circuit Judge.

On the evening of November 19, 1993, an emergency medical evacuation helicopter operated by petitioner Echo, Inc. (Echo) ran out of fuel, lost engine power, and crashed into Casco Bay off the Maine coast, killing three passengers. The Federal Aviation Administration (the FAA) charged the pilot and Echo with violating several aviation safety regulations and issued emergency orders revoking Echo's certificate to operate as an air carrier, a sanction upheld by the National Transportation Safety Board (the Board). Echo petitions for review. We affirm.

## I. *Background*

### A. *Facts*

Echo is a Maine corporation established in 1985 by John G. Rafter, Jr. to provide commercial flight services by helicopter in the Portland area. Rafter is Echo's president, director of operations, director of maintenance, and chief pilot. In 1993, Rafter founded another company, Airmed Skycare, Inc. (Airmed), which was devoted exclusively to emergency medical services.[1] Airmed owned its own helicopter for air ambulance flights and employed flight nurses and paramedics. It contracted with Echo to supply the pilots for its flights. In the afternoon of November 19, 1993, Airmed received a call requesting that a burn victim be flown from Ellsworth, Maine to Portland for treatment. With Rafter as pilot, and flying under Echo's certificate to operate as an air carrier, the helicopter took off from Portland to Ellsworth.

The weather conditions at the time of takeoff were, in the words of Echo, "marginal," because of fog and light rain. Nevertheless, Rafter concluded that the flight could be made safely under Visual Flight Rules (VFR), and he took off. The trip to Ellsworth was successful. The medical team picked up the burn victim, and the helicopter began its return flight. Approximately fifty miles northeast of Portland, however, weather conditions deteriorated. The helicopter, then travelling at an altitude of approximately 800 feet, entered the clouds; Rafter was no longer able to navigate visually. He requested and received Instrument Flight Rules (IFR) handling from air traffic control at the Brunswick Naval Air Station, which instructed him to climb above the clouds to 3,000 feet. Rafter climbed to a higher altitude and proceeded to navigate by the helicopter's instruments.

It is clear that, under normal conditions, neither Rafter nor the helicopter was authorized to operate under IFR. The operations specifications on Echo's air carrier certificate

---

1. Rafter was also Airmed's president and majority shareholder.

authorized Echo to operate on "VFR only." Further, the helicopter did not contain all the equipment required for IFR operation. Finally, Rafter did not have the recent operational experience necessary for IFR operation. Echo maintains that, because of the emergency situation caused by weather conditions, operation under IFR was justified pursuant to 14 C.F.R. § 91.3(b) ("In an inflight emergency requiring immediate action, the pilot in command may deviate from any rule to the extent necessary to meet that emergency."). Rafter did not declare an emergency, however, or advise air traffic that he, Echo, and the helicopter were all unauthorized to operate under IFR, conduct he later ascribed to "pilot ego."

Not having been advised otherwise, the air traffic controller treated the flight as normal IFR traffic. At approximately 8:15 p.m., after tracking the flight for thirty minutes, Brunswick Naval Air Station passed it off to Portland Approach Control. Meanwhile, at the higher elevation, the helicopter was encountering strong headwinds and turbulence, causing slower progress to Portland than Rafter had anticipated. Air traffic in Portland noticed that the helicopter was not maintaining its assigned course or altitude, which Rafter later attributed to the demands of piloting under IFR and in turbulence when the helicopter was not properly equipped for IFR operation. Six or seven minutes after contacting Portland Approach Control, Rafter noticed that he was running low on fuel. He advised Portland air traffic and requested a direct instrument approach to runway 29. Air traffic gave him top priority, but it was too late. Rafter soon reported a loss of fuel pressure, and the engine lost power. About eight miles north of Portland, the helicopter crashed into Casco Bay. The burn patient, paramedic and nurse all died. Rafter survived the crash.

This was not the first time Echo had violated aviation safety regulations. In 1987, Echo was found to have employed unqualified pilots, operated a helicopter with a litter that had not been inspected and approved,

and flown over water with a helicopter that was not equipped with pop-out floats. For these breaches, Echo's operating certificate was suspended for 270 days, 255 days of which were waived pending one year of operation without violations.

### B. *Procedural History*

After the crash, the FAA accused Echo and Rafter of numerous regulatory violations and issued emergency orders immediately revoking Rafter's pilot certificate and Echo's air carrier certificate. A full evidentiary hearing ensued. The Administrative Law Judge (ALJ) upheld revocation of the certificates, accepting certain of the allegations of wrongdoing but rejecting others.[2] Echo and Rafter appealed to the Board. The Board reduced the revocation of Rafter's pilot's certificate to a 180–day suspension, principally based on its determination that Rafter could not be faulted for his initial decision to accept the flight despite the weather conditions. Based on Rafter's misconduct in his capacity as the manager of Echo, however, the Board upheld the revocation of Echo's air carrier certificate.

In particular, the Board found that the emergency weather conditions that developed did not excuse the various regulatory violations caused by the helicopter's sustained operation under IFR. The Board acknowledged that a pilot may deviate from any regulation to respond to an in-flight emergency, but "only to the extent required to meet that emergency." 14 C.F.R. § 91.3(b). It found that, once Rafter was no longer able to operate under VFR, he should have asked air traffic for assistance in landing as soon as possible. Instead, without advising air traffic of an emergency, or that he, his aircraft, and his company were unauthorized to fly under IFR, he obtained IFR clearance, accepted a higher altitude, and proceeded to fly toward Portland for another thirty minutes. The Board found that Rafter, in his capacity as the manager of Echo, had thus displayed a lack of disposition to comply with safety regulations:

**2.** Most notably, the ALJ rejected the allegation that Rafter commenced the flight with insufficient fuel.

[A] serious operational misjudgment that may be excusable as an aberrant occurrence for an individual becomes indefensible when that pilot is, also, the person in control of a carrier's operations, for an air carrier whose management does not adhere unflinchingly to all relevant operational standards does not meet its obligation to provide the highest degree of safety. We think that when respondent Rafter, with full knowledge that neither he nor his aircraft should be operating under IFR, surreptitiously chose to disregard, contrary to numerous requirements, his company's operations specifications and manual by proceeding with a flight he should have ended, he demonstrated that respondent Echo lacks the compliance disposition expected and demanded of an air carrier.

Echo now challenges this order.

## II. *Discussion*

■ Initially, we note that Board decisions are given generous deference on review: they must be affirmed unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Hite v. National Transp. Safety Bd.*, 991 F.2d 17, 20 (1st Cir.1993). Moreover, " 'the strong policy concern for public safety requires that the ·Board be given a wide range of discretion in imposing sanctions.' " *Hite*, 991 F.2d at 20 (quoting *Johnson v. National Transp. Safety Bd.*, 979 F.2d 618, 622 (7th Cir.1992).

■ Echo claims that the Board abused its discretion by revoking its certificate rather than issuing a lesser sanction. It grounds this assertion upon the premise that revocation is allowed only when an air carrier engages in repeated, flagrant, or deliberate regulatory violations.

3. The statute was revised in 1994 without substantive change. It now appears at 49 U.S.C. § 44709(b).

4. Echo points to ¶ 206.b(4) of the FAA order, which states:
   In cases involving businesses, revocation should be sought whenever there is a demonstration of a lack of qualifications. Revocation, would probably be appropriate, for example, in cases involving deliberate or flagrant violations

We disagree. At the relevant time, the statutory authority to revoke an air carrier certificate was found at 49 U.S.C.App. § 1429(a), which provided simply that if, after investigation, the Secretary of Transportation "determines that safety in air commerce or air transportation and the public interest requires, [he] may issue an order ... revoking ... [an] air carrier operating certificate." [3] As guidelines for implementing this broad discretion, an FAA order states:

Revocation of a certificate is used as a remedial measure, when the certificate holder· lacks the necessary qualifications.... [It] is appropriate whenever the certificate holder's conduct demonstrates a lack of the care, judgment and responsibility required of the holder of such a certificate.

*Compliance and· Enforcement Program,* FAA Order No. 2150.3A ¶ 206.b (Feb. 21, 1992). This standard has governed Board decisions for some time. *E.g., Administrator v. Guy Am. Airways, Inc.,* 4 N.T.S.B. 888, 892 (1983) ("Revocation is reserved for those cases in which putative conduct, whether safety-related or otherwise, demonstrates that a certificate holder no longer possesses the requisite qualifications, in terms of care, judgment and responsibility, necessary for continued certification."). We recognized this standard in *Hite,* 991 F.2d at 20.

■ Echo points to language in a different section of the FAA order and certain caselaw as support for its assertion that revocation is appropriate only upon a finding of a pervasive lack of qualifications manifested by deliberate, repeated, or flagrant regulatory violations. The language it notes, however, is nothing but a list of certain instances when revocation might be appropriate; [4] the stan-

or the falsification of records. Revocation also would probably be appropriate in cases in which the certificate holder has committed the same or similar violations in the recent past, or where the certificate holder no longer has, or does not obtain in a reasonable time, the personnel or equipment to conduct its operation in accordance with the [Act] or [federal aviation regulations].

We agree with the Sixth Circuit's observation, made in the context of a challenge to an air

dard itself is as set out above. Further, the cases it cites do not support the existence of the higher standard. For example, *Carey v. Civil Aeronautics Bd.*, 275 F.2d 518, 522 (1st Cir.1960), held that conduct even on a single flight may justify revocation of an airman's certificate. Other cited cases, while involving egregious misconduct, do not establish that such misconduct is a prerequisite to revocation. *E.g., Administrator v. Mikesell,* N.T.S.B. Order No. EA–2788 (1988).

 Echo's other arguments are equally unavailing. It sees an abuse of discretion in the Board's finding that Rafter's conduct during the flight was relevant to his qualifications to manage the operations of the company. For support, it points to a few decisions involving operational misconduct by managers who also had airman's certificates, which held that, based on the particular facts, sanctions should relate to the company's air carrier certificate only. *E.g., Administrator v. Diaz–Saldana,* 1 N.T.S.B. 1599 (1972) (inappropriate to suspend airline president's airman certificate for authorizing company's use of an unairworthy aircraft; since he had not piloted any of the relevant flights, sanction should fall on company alone).

Here, however, Rafter was pilot of a particular flight and simultaneously Echo's president, director of operations, director of maintenance, and chief pilot. Assume that a flight facing the same emergency weather conditions radioed in to Rafter for guidance, and that Rafter, on the ground, told the pilot to request IFR handling without advising air traffic control that the aircraft, the pilot, and the company were each prohibited from flying under IFR. Assume further that Rafter, knowing that IFR was forbidden for these reasons, ordered that the flight continue under IFR for a full thirty minutes. Under such circumstances, it would hardly be an abuse of discretion if the Board were to conclude that Echo showed a lack of the requisite "care, judgment and responsibility necessary for continued certification." So too we find no abuse of discretion here, for

Rafter is not excused from his managerial misconduct because he was piloting the flight at the time.

*Affirmed.*

---

carrier's suspension, that listing several instances warranting a particular sanction "does not imply that other circumstances never warrant" the sanction. *ConnAire, Inc. v. Secretary, United States Dep't of Transp.*, 887 F.2d 723, 727 (6th Cir.1989).