Sidney J. PEW, et al., Plaintiffs,

v.

Leo SCOPINO, et al., Defendants.

Civ. No. 93–317–P–H.

United States District Court,
D. Maine.

March 15, 1995.

Richard L. O'Meara, Christopher B. Branson, Murray Plumb & Murray, Portland, ME, for plaintiffs.

Peter J. Brann, Assistant Attorney General, Augusta, ME, for Skofield, Amoroso,

Kurz, Ouellette, Atwood, Durgin and Stricker.

Robert M. Napolitano, Portland, ME, for Russo.

George T. Dilworth, Assistant Attorney General, Portland, ME, for Sullivan, Dietz, Barker and O'Brien.

Peter J. DeTroy, III, David P. Very, Theodore H. Kirchner, Norman Hanson & DeTroy, Portland, ME, for Tibbetts, Herrick, Hill, Davis and Holland.

William R. Fisher, Monaghan Leahy Hochadel & Libby, Portland, ME, for Scopino and Strome.

Jeffrey T. Edwards, Preti Flaherty Beliveau & Libby, Portland, ME, for Cayer and Carter.

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS

HORNBY, District Judge.

This civil rights lawsuit arises out of Maine's airborne marijuana eradication program. The Maine Department of Public Safety, Drug Enforcement Agency, Army National Guard, and county sheriffs' offices and local law enforcement agencies have cooperated to find and destroy marijuana crops growing illegally in Maine. The National Guard has provided helicopters, pilots and crews; county and local law enforcement agencies have assigned personnel as "spotters" on board the helicopters to look for marijuana and "ground crews" to respond once marijuana is sighted. If the defendants are to be believed, this has been a carefully planned and conducted law enforcement operation with scrupulous attention to householders' Fourth Amendment rights against unreasonable searches. If the plaintiffs are to be believed, the helicopters have swooped low over living areas, frightening children, causing limbs to break off trees, stirring up dust, terrorizing pets and, in one case, killing a steer—all in all, a hazardous and unsafe intrusion into the lives of apparently law-abiding citizens. Because these factual discrepancies are presented on the defendants' motions for summary judgment, I am not in a position to determine which is the correct version or whether the truth lies somewhere in between. So far as the legal principles are concerned, however, I conclude that for all but one of the overflights, even if events occurred as the plaintiffs describe them, damages are not available under the Federal Civil Rights Act, 42 U.S.C. § 1983, and that the plaintiffs should pursue any state law remedies in state court. In all events, none of the plaintiffs are entitled to relief under the Federal Aviation Act or declaratory and injunctive relief under federal law.

## I. BACKGROUND

Because this is a summary judgment motion, I recount the facts in a light most favorable to the plaintiffs. I have not, however, searched the record beyond the parties' statements of material facts and their specific record citations. See Local Rule 19; *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 930–33 (1st Cir.1983).

### A. The Pew Overflight

Marijuana Eradication Program ("MEP") helicopters inspected Sidney Pew's property on July 24, 1992, and again on August 30, 1993. Pew and his family live in a two-story log home on about five acres in a rural and hilly area of Andover in Oxford County. Two of the property lines are marked by a two- to three-foot stone wall, but the walls do not meet each other. At the closest point, the walls are about seventy-five feet away from the house. The house sits on a one-half to one-acre lawn, seventy-five feet from a quarter-acre man-made pond. Pew operates his business out of an office in the house.

At about 2:00 in the afternoon of July 24, 1992, Pew heard a helicopter approaching his property; fifteen to thirty minutes later he could see it. Pew saw the helicopter approach his property at treetop level and saw people in the helicopter through its open side door. The helicopter hovered over the pond in his yard, not more than 200 feet (Pew's estimate) above ground level, low enough for the helicopter's rotor "downwash" to create a chop on the pond water, and to cause trees to sway. The helicopter came within fifty feet of Pew's house, at an altitude Pew describes as "treetop level" and "less than 200 feet."

Because of the noise, Pew could not hear or talk to his wife, and could not work. Pew took a series of photographs of the helicopter as it flew over or near his property. Expert analysis of one of the photographs concludes that the helicopter was no more than 217 feet above the ground and was about 400 feet horizontally away from Pew and his camera as he stood near his front door. Pew, standing near his house, gestured to the helicopter to leave and then gave it "the finger." Pew and his wife could see smiling expressions on the faces of the two crew members at the open door. Pew felt that he was being spied upon, and was emotionally upset by the incident.

On August 30, 1993, an MEP helicopter flew over Pew's home three times, while performing a "grid search." It was always at an altitude of 400 feet or more above the ground, did not cause the trees to sway, and did not stir up dust or dirt.

Pew's home is located three miles from the Andover Airport, four or five miles from another airport, and ten miles from the Dixfield Airport. Numerous small private airstrips are also located within a ten-mile radius. Pew sees civilian aircraft flying near his home about once every two weeks. Andover is in an area designated for military aircraft training operations. Pew is aware that fixed-wing military aircraft flew near his house as often as about once a month throughout the 1980s. Half a dozen times he saw them fly "at treetop level." The frequency of these military flights has recently been reduced because of citizen complaints about noise. Pew has twice seen other helicopters fly near or over his house; one was a 1993 overflight by a rescue helicopter that was larger and flew even lower than those complained of here, but Pew does not remember whether that occurred before or after the 1993 MEP overflight.

## B. The Bowie Overflight

The families of Ben Bowie, Sr. and Ben Bowie, Jr. live within 150 yards of one another on adjoining lots in a rural area of Carthage in Franklin County. Ben Bowie, Jr. lives with his wife and two young children on an acre of land. Ben Bowie, Sr. lives with his wife (Gertrude) and son (Brandon) on 3.9 acres. A lawn surrounds the two houses, creating a single cleared area flanked by woods. On September 17, 1992, in the afternoon, all four members of the Bowie, Jr. family were outside when an MEP helicopter approached. When Ben, Jr. first saw the helicopter it was over a neighbor's house 150 to 200 yards from where he was standing. He could discern three people on board: the pilot, a passenger in front, and a man in the open side doorway looking down at him. The helicopter flew over the property at about treetop level, making a deafening noise and scaring the children. Gertrude Bowie, next door in the Bowie, Sr. home, heard the helicopter and looked out to see that it was over her garden "just a few feet from the house," below treetop level and blowing up dust. She could see a person looking down at her. The helicopter was "right there ... just watching [her]."

Moments later, trees on the Bowie, Jr. property were swaying and branches were blown off as the helicopter hovered forty to sixty feet over a pigpen 80 yards from the Bowie, Jr. house. Ben, Jr. could see that the helicopter crew members were looking right at him and his family; he recognized one crew member, Stacey Carter (whom he knew from school) standing in the open door and looking down. The helicopter, at an altitude of fifty to sixty feet, appeared to follow Gertrude and Brandon as they walked across the lawn to meet up with the Bowie, Jr. family, and continued to follow them, hovering about twenty feet above treetop level, as they walked down a road away from their property. In all, the helicopter flew over the Bowie, Jr. and Sr. property for ten to fifteen minutes; three times it hovered directly over the roof of the Bowie, Sr. house lower than 100 feet above the ground and as low as forty feet over the roof, according to Ben, Jr.'s observations. It appeared to Ben, Jr. that the helicopter crew was observing a "bunch of sumac" that was growing on the Bowie, Sr. property. Based on analysis of the eyewitness reports, the plaintiffs' expert concluded that the helicopter flew at approximately 100 feet above the ground over the Bowie property.

All the members of the Bowie family suffered emotional distress as a result of the overflight. The Bowie, Jr. family's pet steer was found dead at the end of a rope tether after the overflight, and the Bowie, Sr. dog was noticeably shaken up.

Gertrude Bowie has observed airplanes flying over the vicinity of her house as often as two or three times per day. She recalls no helicopter overflights prior to the MEP incident. The nearest airport is Dixfield, about ten miles away. Ben, Jr. heard a helicopter fly near his house about one week prior to the MEP overflight, and has observed airplanes fly over the vicinity of his house about once or twice a week, at altitudes of 1,000 feet or higher.

### C. The Keene Overflight

Ronald and Karen Keene and their daughter used to live in a rented house in the woods along the Webb River in Carthage, Franklin County—less than a two-minute drive from the Bowies. On the afternoon of September 17, 1992, the Keenes were returning home in their truck when they heard the sound of a helicopter as they came up their driveway. Ronald Keene has no memory of the incident, which allegedly traumatized him because of Vietnam experiences. The helicopter appeared to Karen Keene to be at or just below treetop level, as she viewed it through a gap between the left side of the house and a tree. Karen Keene's difficulties with estimating distances makes it impossible to conclude where the helicopter actually was, but the helicopter caused trees to sway back and forth, and a couple of days later a limb from the pine tree near the house was discovered on the ground. The plaintiffs' expert concluded that the helicop-ter flew over the Keene property at or below 200 feet above the ground.[1]

### II. FEDERAL CLAIMS

#### A. Damages

The plaintiffs seek damages under 42 U.S.C. § 1983.[2] They claim that the MEP participants violated their Fourth Amendment right to be free of unreasonable searches as well as section 307 of the Federal Aviation Act, 49 U.S.C. app. § 1348, and Federal Aviation Administration regulations. I conclude that qualified immunity prevents recovery of damages under section 1983 for all but one of the incidents and that the plaintiffs have no cause of action for damages for violation of the Federal Aviation Act and FAA regulations.

#### 1. Qualified Immunity

■ When someone sues an official under section 1983 for damages resulting from the performance of the official's duties, the qualified immunity defense prevents recovery if the conduct in question "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The plaintiffs say that the MEP helicopters violated their Fourth Amendment right to be free of unreasonable searches. It is, of course, clear that the Fourth Amendment prohibits unreasonable searches, but the United States Supreme Court has taught us that the right in question must be stated more specifically than that to determine whether it is "clearly established." *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). On the other hand, there need not be a court decision directly on

---

1. Karen Keene also referred to unidentified helicopters occasionally flying along the Webb River at low altitudes in the summer of 1992. Once prior to September 17, 1992, she saw a helicopter hover over the Keene's unused outhouse, which is only about two car widths away from the house. Ronald Keene was not home on these occasions when Karen Keene observed helicopters prior to September 17, 1992. In light of the defendants' affidavits specifically denying any MEP presence on these earlier dates, Karen Keene's statements are not sufficiently specific to connect the earlier incidents to the defendants and I therefore have not considered them.

2. The cause of action against federal defendants is not under § 1983, but under *Bivens v. Six Unknown Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The qualified immunity issues are identical, however, and I will treat them as if they all arose under § 1983. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 n. 30, 102 S.Ct. 2727, 2738 n. 30, 73 L.Ed.2d 396 (1982). For that reason, I need not decide whether Major General Durgin, Captain Sullivan and three pilots should be treated as state or federal actors.

point to make a right "clearly established." *See id; Germany v. Vance,* 868 F.2d 9, 16 (1st Cir.1989). The first question a court must answer, however, is "whether the plaintiffs have asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If the answer is yes, the next question is whether the constitutional right was "clearly established" at the time so that officials can be held responsible for damages. The questions here are whether the Fourth Amendment creates a constitutional right to keep one's home and curtilage free of law enforcement inspection by low altitude helicopter overflights without a warrant and, if so, whether that right was "clearly established" at the time of these incidents. To avoid repetition of the caselaw analysis, I will—with all deference to *Siegert*—have to consider these questions at least in part simultaneously.

 In assessing whether the defendants violated a constitutional right, I must first determine whether these helicopter inspections amounted to a "search" within the meaning of the Fourth Amendment. The test for that determination is not simply whether a trespass or invasion of property occurred. *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). Instead, the United States Supreme Court limits Fourth Amendment protection to a reasonable expectation of privacy that society is prepared to honor. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986). An inspection that does not violate such a reasonable expectation of privacy is not a search. *Id.*

Moreover, Fourth Amendment protection encompasses only a house and its "curtilage"—the portion of the surrounding real estate "so intimately tied to the house itself that it should be placed under the law's 'umbrella' of Fourth Amendment protection." *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1140, 94 L.Ed.2d 326 (1987). Police may actually trespass on or over open fields and then use that constitutionally permissible trespass to peer into a curtilage without violating the Fourth Amendment. *See id.* at 304, 107 S.Ct. at 1141.

In the context of aerial surveillance, very little is clear in the application of these ground-based principles.[3] The latest Supreme Court case, *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), was a badly split decision. Justice White announced the judgment of the Court, but his opinion commanded only four votes. Justice O'Connor agreed with the outcome, but her reasoning was closer to that of the Brennan three-member dissent and the Blackmun dissent. If vote counting is to determine the meaning of *Riley,* the situation is further complicated by the fact that four members of the *Riley* Court have been replaced. I will start the analysis, therefore, with two earlier decisions whose impact is somewhat clearer, though limited.

In *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the Supreme Court held that when police spotted cultivated marijuana in a fenced-in yard from a fixed-wing aircraft at 1,000 feet altitude they did not violate the Fourth Amendment. Specifically, the Court held that this police surveillance did not even amount to a

**3.** The fact that nothing incriminating the plaintiffs turned up in these helicopter inspections makes the issue more difficult. Relevant Supreme Court caselaw and most lower court cases have dealt not with section 1983 actions for damages, but with suppression motions—i.e., attempts to shield information discovered in a search. Here, however, no such information was discovered and I cannot focus, therefore, on the precise location of what was discovered and whether it was within a home or curtilage and thus whether intimate details of the plaintiffs' lives were exposed. Although the plaintiffs conceded at oral argument that they must prove that the helicopter occupants were *looking* into their curtilages, their complaints are also about such

things as excessive noise, dust and flying debris, fright to people and animals—the kinds of things that ordinarily would generate trespass or nuisance actions or a claim of inverse condemnation, not an illegal search claim. (Compare the remarks of Justice Brennan in dissent in *Florida v. Riley:* "If through noise, wind, dust, and threat of injury from helicopters the State 'interfered with respondent's normal use of the greenhouse or of other parts of the curtilage,' [the property owner] might have a cause of action in inverse condemnation, but that is not what the Fourth Amendment is all about." 488 U.S. 445, 461–62, 109 S.Ct. 693, 703, 102 L.Ed.2d 835 (1989).)

"search," reasoning that the homeowners had no reasonable privacy expectation that they would be exempt from planes flying over their home at 1,000 feet—navigable airspace—and aircraft occupants looking down to see whatever was to be seen. *Ciraolo,* 476 U.S. at 213–14, 106 S.Ct. at 1812–13. In another case decided the same day as *Ciraolo,* the Court decided that the use of an aerial mapping camera for an inspection did not change its privacy conclusion. *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). The Court focused on the intimacy of the details that could be observed using that particular technique and concluded that, although magnification could reveal a number of things not visible to the naked eye, "the photographs here are not so revealing of intimate details as to raise constitutional concerns." 476 U.S. at 238, 106 S.Ct. at 1827.

After these two 1986 cases, then, it was clearly established that no search occurs in an overflight inspection from a fixed-wing aircraft in navigable airspace even with some technological enhancement. It was also apparent that Fourth Amendment concerns are implicated at some level, however, for the Court did not immunize the overflights outright.

The 1989 *Riley* decision dealt specifically with a helicopter overflight. *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835. The four-member opinion written by Justice White, in whose result Justice O'Connor, a fifth member, concurred, seemed to lower the permissible altitude for a fixed-wing overflight to 500 feet, the lower limit of navigable airspace for planes, *id.* at 450, 109 S.Ct. at 696, and for a helicopter to 400 feet, *id.* at 451, 109 S.Ct. at 697. I use this qualified language because Justice White's opinion also stated: "This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law," 488 U.S. at 451, 109 S.Ct. at 697. But as a result of *Riley,* no inspection at or above these altitudes can be said, in *Harlow*'s words, to be "clearly established" as a

search. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

What happens below 400 feet is more problematic. Justice White announced that "we would have a different case if [the flight] had been contrary to law or regulation." *Riley,* 488 U.S. at 451, 109 S.Ct. at 697. In fact, FAA regulations do not limit helicopter minimum altitudes to the navigable airspace for fixed-wing aircraft, but allow them to fly as low as safety considerations permit. Apparently, a homeowner's reasonable expectation of privacy from intrusion in the air can therefore no longer be measured by a precise altitude. It also cannot confidently be measured by the scope of the FAA safety regulation because of White's statement that an inspection from navigable airspace does not necessarily "pass muster under the Fourth Amendment." *Id.* According to White, "not violating the law" is "of obvious importance," but White couples that statement with the observation that nothing in the *Riley* record suggested that 400–foot helicopter flights were so rare in that area that a person could reasonably expect to be free from helicopter overflights at that altitude. *Id.* White's additional observations that the helicopter inspection in *Riley* had not interfered with the "normal use" of the curtilage, that "no intimate details" had been observed, that there was "no undue noise, and no wind, dust or threat of injury," 488 U.S. at 452, 109 S.Ct. at 697, further complicate the inquiry. *See id.* at 452, 109 S.Ct. at 697–98. What if some or all of those factors are present?

Unlike Justice White, Justice O'Connor and four dissenting justices focused on the householder's expectation of privacy given the frequency of other overflights in the area. On this subject, O'Connor and the dissenters differ only on which party bears the burden of proof and, if that is put aside, constitute a five-member majority in *Riley* discounting the significance of the FAA regulations and the other factors Justice White found important. *See id.* at 452–468, 109 S.Ct. at 697–706.

■ This is the unhappy state of Supreme Court precedent.[4] Following *Siegert v. Gil-*

---

4. Local precedents provide no further assistance. The only aerial surveillance case, *United States v.*

*ley* literally, I will attempt to answer the question whether these MEP helicopter inspections actually violated a constitutional right as so defined. *See Siegert v. Gilley*, 500 U.S. at 232, 111 S.Ct. at 1793. First, I conclude that the 1993 Pew inspection did not amount to a Fourth Amendment search. Those flights exceeded the 400–foot level approved in *Riley*, created no particular disruption on the ground, and occurred in an area where low-level overflights were not uncommon. *See Riley*, 488 U.S. at 451–52, 109 S.Ct. at 697–98. On this record, therefore, Pew had no reasonable expectation of privacy against this type of intrusion.

■ I also find that the Keene overflight was not a search within the Fourth Amendment. Although the MEP helicopter flew at the 200–foot or treetop level, there is no indication that it interfered with normal use of the curtilage, observed intimate details or created dust or threat of injury. I will assume that there was undue noise and wind, but these alone, I conclude, are not enough to constitute a search under *Riley*, and there is no specific indication of physical danger to the Keenes. *Id.*[5]

■ I also find the 1992 Pew overflight not a search under the Fourth Amendment. The helicopter did not fly directly over Pew's house. Instead, its closest approach seems to be have been about fifty feet away. The record does not establish a curtilage[6] that would protect such an intrusion.[7] The low

stone walls, which do not even surround the property, do not create an area separate from open fields. The noise clearly created an annoyance for the Pews, but that alone is not enough to constitute a search under *Riley*. *See* 488 U.S. at 451–52, 109 S.Ct. at 697–98. There is no indication that the helicopter could spy anything intimate and there was no physical danger to the Pews. The MEP helicopter was certainly much lower than the flight approved in *Riley*, but the frequency of low-level overflights in the area discounts the significance of that factor.

■ Finally, I conclude that, viewing the evidence most favorably to the plaintiffs, the Bowie inspection did amount to a search within the meaning of the Fourth Amendment. (Given the proximity of the Bowie, Sr. and Bowie, Jr. houses on a property apparently used as a family "compound," and the disruptive effects on both families, I cannot distinguish between Bowie, Sr. and Bowie, Jr.) The helicopter passed directly over the Bowie, Sr. house at an extraordinarily low level—forty feet over the roof. Experts have testified that it was flying in an unsafe manner. Thus, it was not within navigable airspace. *See* Federal Aviation Administration Regulations, 14 C.F.R. § 91.119(d). It directly violated the National Guard policies and orders, which expressly prohibited flights below 400 feet. It interfered with human activities not simply by noise but by

*Bassford*, 812 F.2d 16 (1st Cir.), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987), decided hard on the heels of *Ciraolo*, involved a flight of 1,000 feet, and was therefore easily controlled by *Ciraolo*.

5. The record is silent on the frequency or rarity of other overflights in the vicinity except as described in footnote 1, *supra*.

6. The defendant Cayer, a "spotter" on the 1992 Pew overflight, testified at deposition that the MEP helicopter flew over Pew's curtilage. Cayer's belief does not determine the extent of Pew's curtilage; that is a legal determination that I must make, viewing the facts most favorably to the plaintiff.

7. The Supreme Court decisions have not dealt with the relevant vertical location of an aircraft vis à vis the house and curtilage. Theoretically, one might assume that house lines or curtilage lines ascend vertically into the air and that only

aircraft that invaded these imaginary lines could fall within the search limitations of the Fourth Amendment. There are several difficulties with such an analysis, however. First, it would be almost impossible as a matter of proof for a homeowner to show that the aircraft was vertically in such a precise location, except in cases where the protected curtilage area is very large. Second, for fixed-wing aircraft, most lines of sight for searching are at an angle, rather than directly downward. Helicopters may have greater visibility in this connection, but even so there is some angle in the vision. Finally, *Katz v. United States*, makes clear that in any event the issue is not property lines but the reasonable expectation of privacy, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *United States v. Dunn*, demonstrates that a police officer *trespassing* in an open field can peer into a curtilage without violating the Fourth Amendment. 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

following the movements of Bowie family members and injuring their chattels. It blew up dust and blew down branches. There is nothing in the record to suggest that this type of low-level intrusive overflight occurred frequently, or even occasionally, in the vicinity—apart from the MEP program.

Thus, the remaining questions are whether the Fourth Amendment violation I have just described involved a "clearly established" right and, if so, whether a reasonable person with the information available to these defendants would have known that he or she was violating a clearly established right. *Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3040.

The split decision in *Riley* makes it extraordinarily difficult to define "clear" Fourth Amendment protections against helicopter inspections. 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). Almost by definition, vote-counting analysis—putting aside some differences to find points in common in a split decision—makes it impossible to say that a right is "clearly established," particularly with the replacement of four justices. The qualified immunity defense should shield officials from having to act like constitutional law professors and limit their concern to rights that nonlawyers can define and understand. It is tempting, therefore, to say that after *Riley* nothing is "clearly established" so far as a helicopter overflight is concerned. On the other hand, a court decision directly on point is not required to make out a constitutional violation, *see Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039; *Germany v. Vance,* 868 F.2d 9, 16 (1st Cir.1989), and some things are clear from underlying constitutional principles notwithstanding the confusion the Supreme Court created in applying them in *Riley.*

■ I conclude that the Bowie overflight, *according to the plaintiffs' version of the facts,* violated clearly established Fourth Amendment rights of which the defendants reasonably should have known under any legal analysis. At the most abstract level, the issue is simply whether the defendants should have known that they were invading the Bowies' reasonable expectation of privacy—an expectation that society would consider reasonable, *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811–12, 90 L.Ed.2d 210 (1986); *Riley* did not change that issue. It is not difficult to conclude that society does not expect helicopters to hover forty feet over a house in a rural area for an extensive time, nor to follow people about as they walk on their property. Moving from that level of abstraction and turning to the specific factors considered in *Riley,* 488 U.S. at 450–52, 109 S.Ct. at 696–98, I turn first to the issue of whether the overflight was legal. As described, it was directly contrary to National Guard orders setting a minimum altitude of 400 feet for these MEP flights. Moreover, forty feet over the Bowie house roof is not within the so-called "safe zone" for engine failure, so physical danger to persons and property was present; indeed, there is expert testimony that this flight was unsafe. This lack of safety would amount to a violation of the FAA regulations and take these MEP flights out of navigable airspace. 14 C.F.R. § 91.119. On a second *Riley* factor, the presence of other air traffic in the area, the plaintiffs' evidence indicates that there was no other air traffic at this low altitude and the defendants have not contradicted that reasonable assertion. Thus, the burden of proof disagreement in *Riley* is irrelevant, for whosever burden it is, the Bowies have shown that they had no reason to expect such low altitude inspections. Finally, the MEP inspection as described by the Bowies' evidence clearly created excessive noise, wind, dust and disruption of human activities including physical injury to chattels. The conclusion that these factors add up to a Fourth Amendment violation is obvious under any reading of *Riley*—as demonstrated by the clear legal advice given to the defendants by their lawyers at the outset that they were not to carry out their inspections below 400 feet.

I recognize that it is difficult for a helicopter pilot to measure altitude precisely and that a level flight may encounter sudden variations in distance between the helicopter and the ground, particularly in hilly country. Nevertheless, given a helicopter hovering at forty feet over a house, I cannot conclude on this summary judgment record that a reasonable person with the information available to

the helicopter occupants—pilots or spotters—could have believed that the helicopter was 400 feet or more above the ground, that it was in compliance with FAA and National Guard requirements or that it was avoiding undue noise, wind, dust and disruption of human activities. Answering the question "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct," *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir. 1994), I conclude that on this summary judgment record the answer is no. It is important to observe that this is an *objective* standard. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982). Thus, the question is not what the individual law enforcement personnel on the helicopter actually believed about the constitutionality of their actions, but what they *could reasonably* have believed.

■ The so-called "spotters"—the law enforcement helicopter passengers whose job was to spot marijuana—maintain that they cannot be held liable because they were not flying the helicopter and thus were not responsible for its location horizontally or vertically. In fact, there is a dispute over the influence the spotters exercised in directing the pilots where to go. In any event, even if the ultimate choice of location for the helicopter was within the control of the pilot, the issue here is the *search*. The plaintiffs have admitted that they must prove that the defendants actually were looking into their curtilage. If the spotters in question were peering inside the Bowies' curtilage—and certainly there is evidence on this summary judgment record to prevent my taking that question away from the jury—they cannot take advantage of the pilot's control of the heli-

copter to excuse this unconstitutional invasion of the plaintiffs' protected privacy interest under the Fourth Amendment.

### 2. Supervisory Liability

To this point, I have focused on the helicopter occupants. Since I have found that none of the helicopter inspections infringed constitutional rights except the Bowie incident, there can be no supervisory liability for the Keene or Pew incidents. That leaves as supervisory defendants, therefore, only those who supervised the Bowie overflight.

■ Supervisory liability may not be predicated upon the theory of *respondeat superior*, but only on the basis of a supervisor's own acts or omissions. *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91 (1st Cir.1994). There was no direct participation by these supervisors in the unconstitutional conduct inasmuch as the express policies clearly called for a minimum altitude of 400 feet,[8] and there is no evidence of supervisors directly overriding that limit. The plaintiffs seem to recognize, therefore, that they can make out supervisory liability only by showing that the supervisors tacitly condoned violation of the altitude limits.[9] A supervisor cannot be liable for merely negligent acts; the acts or omissions must amount to reckless, callous, or deliberate indifference [10] to the constitutional rights of others. *Id.* at 92. A plaintiff must also prove causation, an "affirmative link" between the supervisor's acts or omissions and the subordinate's violation of the plaintiffs constitutional rights. *Febus–Rodriguez*, 14 F.3d at 92.

### (a) MDEA and National Guard Supervisors

The plaintiffs contend that Maine Drug Enforcement Agency ("MDEA")[11] and Na-

---

**8.** The minimum was raised to 500 feet for the 1993 MEP.

**9.** At oral argument, the plaintiffs confirmed—as their brief reflects—that this was their basis for supervisory liability.

**10.** The First Circuit has explained that there is no significant difference among the "callous," "reckless," or "deliberate" formulations of the

indifference standard; all suffice to establish supervisory liability under § 1983. *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 92 n. 4 (1st Cir.1994).

**11.** I shall refer to all State of Maine supervisory employees as the MDEA supervisors, although some were employed directly by the Maine Department of Public Safety, of which MDEA is a part.

tional Guard supervisors were aware of a substantial number of complaints regarding low flying, excessive noise, and invasion of privacy by MEP helicopters, yet refused to recognize the legitimacy of the complaints and take appropriate supervisory measures. This, they say, amounted to deliberate indifference to citizens' constitutional rights.

Viewing the summary judgment record most favorably to the plaintiffs, I assume that: (1) these supervisory defendants were aware by 1992 (when the Bowies' homes were overflown) of a significant number of citizen complaints about the manner in which the MEP helicopters were flying; (2) although these supervisors ensured that citizen complaints were investigated, they were more concerned with calming and placating the complaining citizens to improve public relations than they were with preventing violations of citizens' rights; (3) these supervisors refused to believe citizen reports of low-altitude flying, choosing instead to believe the MEP pilots and crew that they did not and would not violate the MEP altitude policy.

■ Such shortcomings might amount to supervisory negligence, but cannot constitute callous indifference to citizens' constitutional rights. MDEA and National Guard supervisors did respond to the complaints; the fact that calming the complainant was an important objective does not demonstrate that the complaints were not taken seriously. The record indicates that the supervisors believed that the complaints were often (1) exaggerated due to the difficulty of accurately perceiving from the ground the altitude of the large, loud and intrusive helicopters, and (2) motivated by ideological opposition to the MEP. Such beliefs may have been unjustified, but acting on them does not demonstrate callous indifference. These supervisors may have placed too much faith in the professionalism of the pilots and the disciplinary repercussions a pilot would face if he flew too low or unsafely, but once again, such an excess of faith does not demonstrate callous indifference to citizens' rights. Unlike the *Gutierrez*

case, there is no evidence that the supervisors here were aware of actual violations (as opposed to complaints) and then failed to take appropriate measures; here, the investigative efforts may have been sloppy or superficial, but the degree of negligence or indifference is far less than in *Gutierrez*. *See Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 562–63 (1st Cir.1989). This record simply fails to demonstrate callous, reckless, or deliberate indifference to citizens' constitutional rights by the MDEA and National Guard supervisory defendants.

### (b) Oxford County Supervisors

■ The plaintiffs claim that the Oxford County supervisors and the county itself[12] abdicated their responsibility to ensure that MEP surveillance was limited to those sites that county officers had designated as targets. County supervisors were responsible for gathering intelligence, selecting target sites for surveillance, and staffing and supervising the ground crews that investigated sites once marijuana was spotted from the air. But they had no influence or control over the altitude and intrusiveness of the helicopter flights, without which there is no Fourth Amendment violation. These supervisors, therefore, are not liable even if the helicopters did violate the plaintiffs' Fourth Amendment rights. The conduct of the county defendants was not affirmatively linked to any violations of the plaintiffs' rights.

\* \* \* \* \* \*

Potential section 1983 liability, therefore, is limited to the Bowie incident and the defendants aboard that helicopter, spotters Stacey L. Carter and Leo J. Scopino, Jr. and pilot-in-command Robert S. O'Brien.

### 3. Federal Aviation Act

Count V of the Complaint seeks damages and equitable relief for violation of section 307 of the Federal Aviation Act, 49 U.S.C. app. § 1348, *reenacted as* 49 U.S.C. § 40103 (1994). That section authorizes the Secretary of Transportation to make air traffic

---

12. The claim against Sheriff Herrick in his official capacity is interpreted as a claim against Oxford County. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

rules governing navigable airspace and the flight of aircraft. The plaintiffs claim that the MEP helicopter overflights violated these federal aviation regulations. *See* 14 C.F.R. § 91.119. The regulations provide that helicopters must always be operated so that "the operation is conducted without hazard to persons or property on the surface" and at an altitude permitting an emergency landing "without undue hazard to persons or property on the surface" if an engine fails. *Id.*

The plaintiffs concede that they have no private cause of action under the Federal Aviation Act regulations. Instead, they seek to enforce the regulations under the Federal Civil Rights Act, 42 U.S.C. § 1983, which provides a cause of action for violations of federal law. The test for determining whether a cause of action is available under section 1983 is (1) whether Congress has created "enforceable rights" and (2) whether Congress has foreclosed private enforcement by providing an alternative comprehensive administrative scheme. *Albiston v. Maine Comm'r of Human Services,* 7 F.3d 258, 262 (1st Cir.1993), citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508–09, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990).

▇ On the first issue I find no indication that Congress has created "enforceable rights" for people like the plaintiffs. It is true that the statute granting authority to the Secretary to prescribe air traffic rules states that such rules are "for the protection of persons and property on the ground," but that is only one of several purposes enumerated. 49 U.S.C. app. § 1348(c), *reenacted as* 49 U.S.C. § 40103(c) (1994). The others are "for the navigation, protection, and identification of aircraft," "for the efficient utilization of the navigable airspace," and "for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects." *Id.* There is no suggestion that Congress intended to create enforceable rights with respect to these various categories. Instead, although citizens have the right to file complaints with the Secretary, 49 U.S.C. app. § 1482(a), *reenacted as* 49 U.S.C. § 46101(a)(1) (1994), it is up to the Secretary to determine whether there is "any reason-

able ground for investigating the complaint," *id.,* and then to make any decision as to enforcement action, which might include an order to compel compliance, 49 U.S.C. app. § 1482(c), *reenacted as* 49 U.S.C. § 46101(a)(3) (1994), a license suspension or revocation, 49 U.S.C. app. § 1429(a), *reenacted as* 49 U.S.C. § 44709(b) (1994), or a civil penalty, 49 U.S.C. app. § 1471, *reenacted as* 49 U.S.C. § 46301 (1994). Judicial review is available only for a person "disclosing a substantial interest in such order." 49 U.S.C. app. § 1486(a), *reenacted as* 49 U.S.C. § 46110(a) (1994). Otherwise, authority to seek judicial enforcement for a violation of the Act or rules promulgated under the Act is given to the Secretary or the National Transportation Safety Board. 49 U.S.C. app. § 1487(a), *reenacted as* 49 U.S.C. § 46106 (1994).

On the second issue, the only circuit court to address it has held that "the comprehensive enforcement scheme provided in the Federal Aviation Act manifests congressional intent to foreclose an action under § 1983." *Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 98 (2d Cir.), *cert. denied,* 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986); *see also Anderson v. USAir, Inc.,* 818 F.2d 49, 55 (D.C.Cir.1987) (extensive and detailed administrative enforcement scheme coupled with civil and criminal penalties and injunctive relief belies intent to create private right of action under Federal Aviation Act); *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 407–08 (9th Cir.1983) (same). The First Circuit has not addressed the issue. The First Circuit has held that no private cause of action exists under two sections of the Federal Aviation Act, but it has permitted private enforcement under a third section of the Act that prohibits state imposition of a "head tax" at an airport. *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9, 14–16 (1st Cir.1987). That third section, however, carries no role for the Secretary or any extensive administrative and judicial enforcement scheme. *Id.* at 16. By contrast, the section in question here, section 307, gives complete authority to the Secretary to prescribe the rules and regulations. Congress clearly had in mind, therefore, that the Secretary would resolve and determine

what standards are necessary for safe operation of helicopters. Development of those rules has taken place through decisions by Administrative Law Judges and the National Transportation Safety Board, in which the Secretary has penalized pilots for flying their aircraft unsafely. *See, e.g., Harris v. Holmes,* 1992 WL 106897 (N.T.S.B.1992) (suspending pilots' licenses for flying helicopters simultaneously too low and slowly, applying the standards of an "unacceptably high" "likelihood of harm" and an "exercise of judgment [that] was clearly deficient"); *Harris v. Oeming,* 1992 WL 101265 (N.T.S.B. 1992) (same). When the Secretary does interpret the regulations in this fashion, the courts give "generous deference" to what the Secretary concludes the safety regulations require. *E.g., Echo, Inc. v. Hinson,* 48 F.3d 8, 11 (1st Cir.1995) (reviewing NTSB order revoking a certificate to operate as an air carrier for failure to comply with safety regulations); *Hill v. Nat'l Transp. Safety Bd.,* 886 F.2d 1275, 1278 (10th Cir.1989). I agree with the Second Circuit that Congress has thus provided a comprehensive enforcement scheme such that section 1983 does not afford additional relief.[13]

### B. Declaratory and Injunctive Relief

In addition to damages, the plaintiffs seek a declaration that the MEP program is illegal and an injunction against continuing it. The Marijuana Eradication Program was discontinued at the end of 1993 for lack of funding, however. There was no program during 1994 and there is no funding projected for 1995.[14] Furthermore, if the program is ever resumed, it is doubtful that the plaintiffs are significantly at risk of further MEP overflights, specifically unconstitutional overflights.[15]

The United States Supreme Court has made clear that federal district courts should not issue injunctive relief on constitutional grounds where a challenged activity has ended and the plaintiff does not show a "real and immediate threat" of repetition. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). The First Circuit, applying *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), requires me to ask two questions in a declaratory judgment case: (1) Is the issue "fit for review"? and (2) What is the "extent of the hardship" for the plaintiff? *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 535–36 (1st Cir.1995).[16] The first question concerning fitness for review is "whether the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all," *Massachusetts Ass'n of Afro–American Police, Inc. v. Boston Police Dep't,* 973 F.2d 18, 20 (1st Cir.1992); in other words, the *Lyons* inquiries. *See Lyons,* 461 U.S. at 109, 111, 103 S.Ct. at 1669, 1670. Here, the likelihood of further unconstitutional low-level MEP overflights over the houses or curtilage is simply too remote to pass that fitness test for declaratory or injunctive relief. The second question is the extent of hardship. The plaintiffs are not about to take action or

13. I am not persuaded by District Judge Aguilar's reasoning in *National Organization for the Reform of Marijuana Laws v. Mullen,* 608 F.Supp. 945, 961 (D.Cal.1985), that courts, rather than the Secretary, should provide enforcement because Congress could not have anticipated the massive joint federal-state programs searching for marijuana cultivation.

14. The plaintiffs' reference to a newspaper article in which one of the defendants is quoted as hoping for funding is hearsay, inadmissible on a motion for summary judgment, has no probative value in any event, and is countered by more recent articles—of which I could take judicial notice—describing the Governor's announced intention *not* to seek funding for 1995.

15. The Keenes have now dropped their claims for injunctive and declaratory relief, apparently because they have moved. Plaintiff's Objection to Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law, p. 34 n. 16.

16. The two-part "fitness/hardship" test set forth in *Abbott Labs* has become a well-settled rule of administrative law, precluding judicial review of agency rule-making decisions that have yet to be implemented or enforced. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Since the First Circuit in *Ernst & Young* identified the test more broadly as the proper ripeness inquiry for the declaratory judgment statute, I also apply it here. *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 535–36 (1st Cir.1995).

refrain from action based upon the MEP program. Thus, there is no particular hardship in denying declaratory relief.

Declaratory and injunctive relief is therefore unavailable.

### III. State Law Claims

■ Since only the Bowies are entitled to any relief on their federal causes of action, I decline to exercise supplemental jurisdiction over the state law claims of Pew and the Keenes. 28 U.S.C. § 1367(c); *see Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) (dismissal of state claims generally proper when federal claims eliminated before trial).

### A. Implied Action Under Maine Constitution

■ Unlike the United States Supreme Court in *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Maine's Law Court has never recognized a cause of action for damages based solely upon violation of the Maine Constitution. There is no basis for me as a federal judge to predict that the Maine Law Court would take such a step. The plaintiffs' claim to recover such damages is rejected.

### B. Maine Civil Rights Act

■ In Count VI, the plaintiffs assert a claim under the Maine Civil Rights Act, 5 M.R.S.A. §§ 4681–85 ("MCRA"). That statute creates liability for any person who uses or threatens "physical force or violence" in order to interfere intentionally with rights secured by the federal or state constitution or laws. Physical force or violence, or its threat, is missing here.[17] The plaintiffs argue that the helicopters' "rotor downwash" and deafening noise amount to such "physical force," but I am not persuaded. There is simply no evidence that the defendants intentionally used or threatened to use the helicopter's wind or noise as the means to violate the plaintiffs' Fourth Amendment rights to be free of a search.

Moreover, the Maine Law Court has held that the federal defense of qualified immunity applies squarely to the Maine Civil Rights Act as well. *Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me.1994). Every defendant except spotters Scopino and Carter and pilot O'Brien is therefore exempt from liability on this ground as well. Finally, since the State is not a "person" under the MCRA, it cannot be liable. *Id.* at 1158.

### C. State Law Tort Claims

The plaintiffs make state law tort claims of nuisance and infliction (negligent and intentional) of emotional distress. These claims are governed by the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8116. But the plaintiffs have dropped their state tort law claims against the National Guard defendants and are pursuing them instead through the administrative process of the Federal Tort Claims Act. Members of the Maine National Guard are immune from state civil and criminal liability for conduct during active duty. 37–B M.R.S.A. § 185. That leaves only defendant spotters Carter and Scopino on the state tort law claims.

#### 1. Notice Requirement

■ The defendants Carter and Scopino argue that the plaintiffs failed to comply with the notice provision of the Maine Tort Claims Act, 14 M.R.S.A. § 8107. Section 8107(1)(C) requires that a tort claim notice contain "the name of any governmental employee involved, *if known*." (emphasis added). The plaintiffs maintain that there was good cause for their delay in providing notice concerning Carter and Scopino because they had to discover the identities of the spotters. But Ben Bowie, Jr. saw and recognized Carter as the helicopter hovered overhead. Therefore, the plaintiffs have not shown good cause for their failure to notify Carter or his employer, the Town of Rumford, of their claim within 180 days of the incident. I grant summary judgment to Carter on Counts VII, VIII, and IX. On the other hand, there is no indication that

---

**17.** The Maine Legislature broadened the scope of the Maine Civil Rights Act in 1993 to provide a remedy for intentional interference with a person's civil rights by "damage or destruction of property or trespassing on property." Laws 1993, c. 442. The amendment became effective October 12, 1993 and therefore does not apply to this case, since the last overflight occurred on August 30, 1993.

the plaintiffs knew or should have known Scopino's identity when they gave notice to the MDEA or at any time before his identity was disclosed by the defendants in discovery. Thus, there was good cause for the notice delay concerning Scopino.

### 2. Discretionary Immunity: Officers

■ The defendant Scopino also argues that he is entitled to discretionary immunity under section 8111(1)(C) of the Maine Tort Claims Act, which insulates government employees from tort liability arising out of discretionary functions or duties. Although it is generally true that law enforcement investigations such as searches involve discretionary functions, the plaintiff's assertions here are that the authorities had promulgated very strict requirements that narrowed the scope of the officers' discretion (specifically, an explicit prohibition that the helicopter inspections not go below 400 feet altitude) and that the nuisance and distress resulted from a low-level flyover that clearly violated these requirements. I have ruled that the summary judgment record requires me to leave to the jury whether the spotters had a role in determining the helicopter's altitude—an essential part of the nuisance and distress claims. I am not at this time prepared to say that Scopino acted within the scope of his discretion protected by section 8111(1)(C) for these tort claims. *See Polley v. Atwell,* 581 A.2d 410 (Me.1990) (conduct that clearly exceeds the scope of any discretion officer could have possessed not entitled to discretionary function immunity under § 8111(1)(C)). Accordingly, Counts VII, VIII and IX will proceed against Scopino.

### 3. Discretionary Immunity: Supervisors

To the extent that the tort claims (Counts VII, VIII, and IX) against the state supervisors are to be construed as claims against the State of Maine, the state is entitled to immunity under section 8103 of the Maine Tort Claims Act. The plaintiffs have made no argument that any of the exceptions to the state's immunity apply here.

■ The MDEA supervisors in their individual capacities are also immune from tort liability under section 8111(1)(C) of the Maine Tort Claims Act, the discretionary function immunity. The plaintiffs concede that the supervision of MDEA and MEP officers and the investigation of citizen complaints are discretionary functions; I agree, because those functions require "the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved." *Hegarty v. Somerset County,* 848 F.Supp. 257, 270 (D.Me.1994), *stay issued* 25 F.3d 17 (1st Cir.1994), *quoting Polley v. Atwell,* 581 A.2d 410, 413 (Me.1990). Maine courts strictly construe any exception to governmental immunity. *Clockedile v. State Dept. of Transportation,* 437 A.2d 187, 189 (Me.1981). These supervisors did not "clearly exceed[ ] the scope of any discretion they could have possessed" by their confidence that the flight crews did not and would not violate the altitude rule, by discounting the veracity of the complaints, or by failing to take additional supervisory measures. *See Polley v. Atwell,* 581 A.2d at 414.

The plaintiffs also bring claims against Oxford County officers Davis and Holland in their individual and official capacities, and against county Sheriff Herrick in his official capacity. The plaintiffs assert that Oxford County and its employees have waived their immunity under the Maine Tort Claims Act by procuring liability insurance which covers claims to which they are otherwise immune, as provided in 14 M.R.S.A. § 8116. I need not decide that question, however. As I explained in my discussion of the federal supervisory claims, there is no causal link between the conduct and duties of the Oxford County defendants and the low altitude, intrusive overflights. The Oxford County defendants cannot be liable for any of the torts of which plaintiffs complain.

### IV. OTHER PENDING MOTIONS

### A. Discovery Dispute

■ The plaintiffs' object under Fed. R.Civ.P. 72(a) to the Magistrate Judge's denial of their motion to compel further production of documents. The Magistrate denied the motion based on (1) the representation by the state defendants' lawyer that all of the requested documents had been produced and (2) his finding that the defendants had fol-

lowed a reasonable procedure to ensure full production. The plaintiffs urge further discovery because a small number of documents were produced subsequent to the Assistant Attorney General's representation that production was complete and because several deponents referred to documents that apparently were not among those produced. But the plaintiffs do not refer to any particular document of material significance that has not been produced. They point to no particular person holding unproduced documents or any place where such documents are likely to be found. A general order that all defendants search again for anything relevant that they might find would impose a cost on the defendants that is unjustifiable absent a showing that some specific documents of substantial significance have yet to be produced. At most, the plaintiffs have shown that some relevant documents that once existed are missing or destroyed, but this falls short of demonstrating that the Magistrate's ruling was clearly erroneous or contrary to law. Moreover, the plaintiffs' request for direct access to the defendants' files is unreasonable. Therefore the objection is DENIED.

### B. Barnett Affidavit

The state defendants have objected to the plaintiffs' late filing of the affidavit of Gilbert Barnett. The affidavit supports and is referred to in the plaintiffs' memorandum opposing summary judgment, but was not filed until one month after the defendants were obligated to file their response to plaintiffs' memorandum. The plaintiffs' lawyer has stated that the affidavit was inadvertently omitted from their earlier filing. I accept that explanation. The state defendants' have not shown any prejudice from the late filing. Therefore the objection is DENIED.

### V. CONCLUSION

Accordingly, the defendants' motions for summary judgment are DENIED as to defendants Scopino, Carter and O'Brien on Count I, and as to defendant Scopino on Count VII, VIII and IX, but in all other respects are GRANTED. Partial summary judgment shall be entered accordingly. The plaintiffs voluntarily dismiss Counts II and IV according to

their memorandum opposing summary judgment, and voluntarily dismissed Counts VII, VIII and IX previously as to National Guard pilot defendants Barker, Dietz, O'Brien and Sullivan, *see* Endorsement to Docket Item No. 60.

So ORDERED.