**Karen JENNESS, et al.**

v.

**Mark NICKERSON, et al.**

Supreme Judicial Court of Maine.

Argued Jan. 6, 1994.
Decided Feb. 15, 1994.

Paul F. Macri (orally), Berman & Simmons, P.A., Lewiston, for plaintiffs.

Paul Stern (orally), Asst. Atty. Gen., Augusta, for defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, COLLINS, RUDMAN, and DANA, JJ.

WATHEN, Chief Justice.

Defendants Mark Nickerson and Conrad McNaughton (the Officers) appeal from an order of the Superior Court (Kennebec County, *Delahanty, C.J.*) denying a summary judgment on plaintiffs' federal Civil Rights Act, 42 U.S.C. § 1983, claim against them. The Officers argue that they are entitled to qualified immunity from plaintiffs' federal claim. Plaintiffs cross-appeal from that portion of the Superior Court's order that granted the Officers a summary judgment on all other claims against them and from a previous order (*Mead, J.*) granting defendant State of Maine's motion to dismiss all claims against it. Plaintiffs contend that the State is a proper defendant under the Maine Civil Rights Act, 5 M.R.S.A. §§ 4681–85 (Supp. 1992), and that there are genuine issues of material fact concerning the Officers' violation of plaintiffs' civil rights and their immunity from claims under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (1980 & Supp.1992). We conclude that defendants are immune from plaintiffs' claim, and we remand for entry of judgment for defendants on all claims.

This case arises from the execution of a search warrant at the residence of Richard Willette, his companion Karen Jenness, and their daughter on the night of January 4–5, 1990. Jenness and her daughter are plaintiffs here. They claim that the manner in which the Officers conducted the search violated their rights under the Maine and United States Constitutions and that the Officers' conduct gives rise to liability under the Maine Tort Claims Act.

 This appeal results from the denial of a motion for a summary judgment. Ordinarily review of the denial of such a motion is barred by the final judgment rule. An exception is made for a motion based on immunity from trial which is lost if a summary judgment is improperly denied. *See Mitchell*

*v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The standard of review requires that "[t]he party seeking the summary judgment has the burden of demonstrating clearly that there is no genuine issue of fact. Any doubt on this score will be resolved against him and the opposing party will be given the benefit of any inferences which might reasonably be drawn from the evidence." 2 Field, McKusick & Wroth, *Maine Civil Practice* § 56.4 at 39 (2d ed. 1970) (footnotes omitted).

Viewed most favorably to plaintiffs, the facts may be summarized as follows: The Officers and other law enforcement personnel executed the search warrant at plaintiffs' residence starting between 11:00 p.m. and midnight. In a sworn affidavit in support of the warrant, Trooper Thomas Ballard stated that Willette "has several loaded firearms in the house. Officer safety is a consideration." In depositions, both Nickerson and McNaughton also stated that they were concerned about officer safety. Jenness admitted that a pistol and one or two rifles were in the house—the rifles in her bedroom.

When the Officers arrived at the Willette residence, they were admitted by Richard Willette. Nickerson immediately took him into custody and placed him face down on the floor. McNaughton proceeded to search the garage. Another officer went to the daughter's room. The lights were off. She testified that the officer pointed a gun at her, but pointed it down as soon as he saw that she was a child. Jenness testified that she saw the officer with his gun pointed at her daughter, but he put it down when they left her room.

Other officers went to Jenness's bedroom. Jenness was sleeping naked with the lights off. One officer pointed a gun at Jenness and ordered her to the floor. She grabbed at a pillow to cover herself. Someone grabbed her and she went to the floor, but she was not hurt. She lay on the floor naked, face down, with her feet to the door. Jenness testified that she didn't know how long she remained on the floor, but that it "seemed like forever, maybe ten minutes." The daughter could see Jenness and testified that it was a "[c]ouple minutes maybe" that

Jenness lay on the floor before being brought out into the living room. During the time Jenness was on the floor, officers (including McNaughton) walked over her to search the bedroom. Guns were found in the bedroom during the search. One of the officers then let Jenness stand up, and a couple of seconds later gave her a sheet to cover herself and she was then seated on the living room couch.

The daughter asked to go to the bathroom within about five minutes of sitting down on the couch. Although her request was initially refused, eventually she was allowed to go, but the bathroom door was kept open. Jenness asked to get dressed just after sitting down on the couch. The second time she asked, about half an hour later, she was allowed to dress. Nickerson testified that the delay was necessary in order to ensure that the area was secure. He followed Jenness into the bedroom where she picked out some clothes, then to the bathroom where she changed. Nickerson did not allow Jenness to fully close the door. Jenness looked out at Nickerson several times while changing; he was looking away all but once, when "he looked in and said hurry up and turned his head." The daughter testified that Nickerson was staring out into the kitchen most of the time, but that he looked into the bathroom a couple of times.

The daughter was permitted to go to a neighbor's house at some time between 1:00 and 1:45 a.m. Jenness was not allowed to leave until near the end of the search, sometime between 4:00 and 5:00 a.m. Nickerson testified to several reasons for detaining Jenness, including a concern that evidence in other locations being searched could be destroyed if Jenness were released.

Nickerson questioned Jenness concerning her involvement with the stolen property. He never gave her a *Miranda* warning, testifying that there was no need as she was not a suspect. Jenness did not speak to a lawyer before or during questioning. She asked to speak to her attorney but the request was refused.

At some point during the search of the Willette residence, an officer found several photographs and showed them to Nickerson.

The photographs included some of Jenness and Willette engaged in intimate activity, some of Jenness without clothes, and some of her daughter without clothes. Jenness initially refused to discuss the photographs and any improper involvement on the part of her daughter. She testified that Nickerson coerced her into a discussion by threatening that she could lose her daughter if she did not cooperate. Jenness explained the child's involvement satisfactorily, and the issue was dropped. During the discussion, Jenness looked into the living room and saw McNaughton on the telephone. He was looking at her, and she heard him say he was ready to make love. Jenness was then allowed to leave the house.

Plaintiffs filed suit against the Officers and the State alleging liability pursuant to the federal Civil Rights Act, 42 U.S.C. § 1983, for violations of the United States Constitution and liability under the Maine Civil Rights Act, 5 M.R.S.A. § 4681 *et seq.* ("MCRA") and the Maine Tort Claims Act, 14 M.R.S.A. § 8101 *et seq.* ("MTCA"). All claims against the State were dismissed by the Superior Court (Mead, J.). The court (*Delahanty, C.J.*) granted a summary judgment for the Officers on all claims against them under the MCRA and the MTCA, but denied a summary judgment on the federal Civil Rights Act claim.

▆▆▆▆ Even considered in the light most favorable to plaintiffs, the facts demonstrate that the Officers are entitled to qualified immunity from the section 1983 claim against them. "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted); *see also Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (qualified immunity available to state government actors); *McNicholas v. Bickford,* 612 A.2d 866, 870 (Me.1992). Our inquiry is very fact-specific: "in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107

S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Government actors are not "expected to determine the manner in which the law's grey areas will be clarified and refined." *McNicholas*, 612 A.2d at 870 (*quoting Borucki v. Ryan*, 827 F.2d 836, 838 (1st Cir.1987)).

 The Officers here violated no clearly-established rights. Plaintiffs argue that the Officers' actions in interrogating Jenness without informing her of her *Miranda* rights and in not allowing her to remain silent amounted at the time to a clear constitutional violation. We note, however, "[a] simple failure to administer *Miranda* warnings is not itself a violation of the Fifth Amendment." *Oregon v. Elstad*, 470 U.S. 298, 304, 306 n. 1, 105 S.Ct. 1285, 1290, 1292 n. 1, 84 L.Ed.2d 222 (1985) (citation omitted). Also, at least prior to the actions at issue here, it was clear that there was no constitutional violation for questioning in the face of a refusal to talk, so long as that information was not used at trial. *See id.* at 304, 105 S.Ct. at 1290; *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir.1989) ("Fifth Amendment does not forbid the forcible extraction of information but only the use of information so extracted in a criminal case").

 Jenness argues that her right to counsel as guaranteed by the Sixth Amendment was violated because she told Nickerson that she wanted to call her attorney but Nickerson refused. However, the Sixth Amendment right to counsel is not triggered until criminal charges are brought, *State v. Pettingill*, 611 A.2d 88, 90 (Me.1992) (*citing Maine v. Moulton*, 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985)), and it is undisputed that no formal charges had been filed against Jenness at the time of the alleged violation of her right to counsel. Jenness had no right to counsel at the time of her request.

 Plaintiffs claim that the length of their detention constituted a constitutional violation. "[A] warrant to search for contraband founded on probable cause carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). Factors to be taken into consideration when determining if a detention is proper include the risk of flight, risk of harm to officers, concealment or destruction of evidence, and the orderly completion of the search. *Id.* at 702–703, 101 S.Ct. at 2594. The court properly determined that the length of plaintiffs' detentions, two hours for the daughter and five hours for Jenness, does not violate the constitution.

 Plaintiffs argue that Nickerson violated Jenness's rights simply by examining the photographs, as they were outside the scope of the search warrant. Photographs were subject to examination by the express terms of the search warrant. The officers could only determine whether photographs in the Willette residence fell within the categories described in the warrant by looking at them. Any information depicted by the photograph came into plain sight and was properly subject to further investigation. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1050, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983) (if while conducting a proper search for weapons, "the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband").

 Jenness next complains of the threats Nickerson made to force her to discuss the photographs and her knowledge of Willette's stolen property. The test for improper questioning is whether the tactics used "shock the conscience."[1] *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991). *Wilcox v. Ford*, 813 F.2d 1140 (11th Cir.1987), is the only case cited by plaintiffs which both predates the Officers' actions and discusses coercive interrogation techniques. There

---

1. The Supreme Court has held that Fourth Amendment claims must be analyzed under the "reasonableness" standard rather than the "shocks the conscience" test for substantive due process claims, because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive government conduct." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). When, however, there is no explicit textual source of protection, as in claims of coercive interrogation tactics, the "shocks the conscience" test may still be used. *See Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir.1991).

three witnesses were interrogated in police custody. One was "a very old, illiterate black man;" the police threatened to charge him with murder and to lynch him, they put words into his mouth, and told him he was headed for eternal damnation. *Id.* at 1147. The second was a thirty-five year old black man whom officers threatened to hold indefinitely and to "fry [his] ass." *Id.* The last was an illiterate person in his late sixties. *Id.* The police interrogated him for over eight and a half hours without food or water, told him that he would die in prison, and threatened to send him to the electric chair. *Id.* The Eleventh Circuit found no constitutional violation because the behavior did not shock the conscience. *Id.* at 1148. Comparing the tactics used here, it cannot be said that it was "clearly established" that threatening to charge Jenness with a crime, take away her child, or send her boyfriend to prison violated any of Jenness's constitutional rights. *See also Warren v. City of Lincoln,* 864 F.2d 1436, 1438 (8th Cir.1989); .816 F.2d 1254, 1255–56 (8th Cir.1987) (prior opinion in same case).

■ The plaintiffs argue that the search was so unreasonable as to violate their rights. They point to the refusal to allow the daughter to go to the bathroom and forcing Jenness to lie face down on the floor naked. Whether a constitutional violation exists for forcing a person to be viewed naked by members of the opposite sex depends on the reasonableness of the actions under the circumstances. *See Fischer v. Washington Metro. Area Transit Auth.,* 690 F.2d 1133, 1142 (4th Cir.1982); *Lee v. Downs,* 641 F.2d 1117, 1119 (4th Cir.1981); *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983). *Lee* is particularly instructive, as it involved both reasonable and unreasonable behavior. In affirming a jury verdict, the court stated that

> Most people ... have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not *reasonably necessary,* that sort of degradation is not to be visited upon those confined in our prisons.

*Lee,* 641 F.2d at 1119 (emphasis added). The plaintiff, a prisoner, attempted suicide, so guards told her that they needed to take all her clothing—including her undergarments. *Id.* at 1118. The prisoner agreed to remove her clothes if the male guards left first, but instead the male guards held her while a female guard took her underclothes. *Id.* at 1118–1119. The court agreed with the jury that this was unreasonable because after the prisoner agreed to cooperate it was unnecessary to forcibly take her clothes while males were present. *Id.* at 1120. Later, the prisoner, then held in a special ward, set her paper dress on fire and danced naked around the flames. *Id.* at 1119. She told the guards that she had more matches in a place where they would never be found. *Id.* There were not enough female guards to restrain the "big and strong" prisoner on short notice, so male guards held the naked prisoner while a female guard forcibly performed a vaginal search. *Id.* at 1120–1121. Because of the need to immediately search for matches, the court agreed that this search was reasonable. *Id.* at 1120–1121.

■ Although the Supreme Court has not addressed the specific issue now before this Court, it has emphasized the importance of exigent circumstances in other areas. For example, in *Michigan v. Long,* 463 U.S. 1032, 1052, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201 (1983), the Court discussed the need to search the interior of a vehicle during a legitimate traffic stop:

> [I]f a suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will have access to any weapons inside. Or, as here, the suspect may be permitted to reenter his vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation ... involves a police investigation "at close range," when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger." In such circumstances, we have not required that officers adopt alternative means to ensure their safety in

order to avoid the intrusion involved in a *Terry* encounter.

(citations and footnote omitted; emphasis in original). In light of these cases, forcing a resident of a house to lie naked on the floor during a search for weapons does not clearly violate her constitutional or statutory rights.

Plaintiffs argue that there were no exigent circumstances—that "there was no real threat that [Jenness] would have a weapon." Even resolving all disputed issues of fact in plaintiffs' favor, the facts belie their contention. The Officers entered a house where they believed stolen guns were being kept. They were concerned for their safety. Jenness admits that firearms were present in her room. As an officer entered Jenness's bedroom in the dark and ordered her to the floor, she grabbed for something. Jenness was forced to lie on the floor naked while officers searched her room. She was forced to stand up before covering herself. The exigent circumstances of the known presence of weapons, plus Jenness's grabbing at something when ordered to the floor, justify these methods. The Officers violated no "clearly established" rights.

■■■ Plaintiffs argue that the Officers had a duty to intervene on their behalf when other officers violated their constitutional rights, and that by failing to intervene the Officers themselves violated clearly established rights. An officer may be liable for the acts of another officer—even a superior—taken in his presence [2] that violate civil rights. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988); *Putnam v. Gerloff*, 639 F.2d 415, 423 (8th Cir.1981); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972). A violation must actually take place to support liability for failure to intervene. *See, e.g., Putnam*, 639 F.2d at 423–424. Because there were no violations here, there is no liability for the Officers' failure to intervene.

■■■ Finally, plaintiffs argue that the Officers' actions as a whole, give rise, at a minimum, to a factual question as to whether the Officers violated plaintiffs' rights. We

disagree. Because each individual action does not violate the constitution, the totality of those actions does not violate plaintiffs' rights. Although plaintiffs argue that the Officers were "arrogant, cynical and voyeuristic," that also does not violate the constitution:

> Certainly being humiliated, denigrated and frightened by the local police is an experience nobody should have to endure.... The Fourteenth Amendment does not protect against all intrusions of one's peace of mind, however. Despicable and wrongful as it may have been, [this behavior] was not the kind of conduct for which the due process clause provides redress....

*Bibbo v. Mulhern*, 621 F.Supp. 1018, 1025 (D.Mass.1985) (footnote omitted). The Superior Court erred in not granting a summary judgment for the Officers on all section 1983 claims against them.

■■■ Having disposed of the federal claims, we now address plaintiffs' cross-appeal. They argue that the Superior Court erred in holding that the State is not a proper defendant under the Maine Civil Rights Act. The MCRA provides a private cause of action for violations of constitutional rights by "any person." *See* 5 M.R.S.A. § 4682 (Supp.1992). The MCRA "was patterned after 42 U.S.C. § 1983." *Grenier v. Kennebec County, Maine*, 733 F.Supp. 455, 458 n. 6 (D.Me.1990). The Supreme Court held that "a state is not a person within the meaning of § 1983." *See Will v. Michigan Department of State Police*, 491 U.S. 58, 64, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989). Furthermore, "it is the general rule in Maine that the State is not bound by a statute unless expressly named therein." *State v. Crommett*, 151 Me. 188, 193, 116 A.2d 614 (1955) (holding statute of limitations does not apply to State). Therefore, because the Legislature did not express an intent to include the State within the definition of a "person" under the MCRA, the Superior Court correctly determined that the State is not a "person" within the scope of the statute.

*Bruner v. Dunaway*, 684 F.2d 422, 425–427 (6th Cir.1982); *Putnam*, 639 F.2d at 423–424.

---

**2.** If, however, the officer does not see the violation, or has no realistic opportunity to stop it, he cannot be held liable. *O'Neill*, 839 F.2d at 11;

Plaintiffs next argue that the Superior Court erred in granting a summary judgment for the Officers on their claims under the Maine Civil Rights Act. Plaintiffs agree, however, that the qualified immunity analysis under section 1983 also applies to the MCRA. Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA. The Superior Court properly granted summary judgment for the Officers on the MCRA claims.

Finally, the plaintiffs argue that the Superior Court erroneously determined that the Officers were immune from claims under the Maine Tort Claims Act. Plaintiffs argue that the immunity provision in section 8111(1)(C) does not apply because the Officers intentionally violated their rights. Contrary to plaintiffs' assertion, the immunity is available even for intentional acts. *See Polley v. Atwell*, 581 A.2d 410, 413–414 (Me. 1990). Because the Officers were conducting discretionary acts, the Superior Court properly found that section 8111(1)(C) renders them immune from suit.

The entry is:

Denial of summary judgment vacated. Remanded for entry of a summary judgment in favor of defendants Nickerson and McNaughton in the section 1983 action. The order in all other respects is affirmed.

All concurring.