Norman L. BERTHIAUME, Plaintiff,

v.

Jean C. CARON, Betty B. Clark, James B. Bivins, and William T. O'Donohue, Defendants.

Civil No. 94–86–P–C.

United States District Court, D. Maine.

July 10, 1997.

of Material Facts, without more, is insufficient to withstand summary judgment.

Peter J. Detroy, III, Terry A. Fralich, Anne M. Carney, Norman, Hanson & Detroy, Portland, ME, for Plaintiff Norman L. Berthiaume.

Jeffrey T. Edwards, Edward R. Benjamin, Jr., Kevin J. Beal, Preti, Flaherty, Beliveau & Pachios, Portland, ME, for Defendant Jean Caron.

Joseph H. Groff, Jensen, Baird, Gardner & Henry, Portland, ME, for Defendant Betty B. Clark.

Michael E. Saucier, Thompson & Bowie, Portland, ME, Timothy W. Collier, Asst. Atty. Gen., Augusta, ME, for Defendants Kathi F. Murray, Helen Twombly, Patricia A Vampatella, Donald E. Pray and Marie Fisher.

William R. Fisher, Monaghan, Leahy, Hochadel & Libby, Portland, ME, for Defendant James D. Bivins.

Harrison Richardson, Richardson, Whitman, Large & Badger, Portland, ME, for Defendant William T. O'Donohue PHD.

*MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

GENE CARTER, District Judge.

Plaintiff Norman L. Berthiaume alleges that his federal civil rights, secured by the United States Constitution, to substantive and procedural due process, 42 U.S.C. § 1983 (Count I), as well as his right to be free from unreasonable searches, as secured by the Maine Constitution, 5 M.R.S.A. § 4682 (Count II) were violated by Defendants Jean Caron, Betty B. Clark, James D. Bivins, and William T. O'Donohue. Fourth Amended Complaint (Docket No. 45). In addition, Plaintiff raises a negligence claim against Defendant William T. O'Donohue (Count III).[1] Plaintiff seeks compensatory and punitive damages (Count IV) from Defendants. All of the claims arise out of a "penile plethysmograph" test which Plaintiff alleges he was forced to undergo as a condition of his continued professional licensure as a nurse following his criminal conviction on a federal charge of importation of obscene material.

Defendant Clark was the Chair of the Maine Board of Nursing (the "Board") at the time of the events set forth in the Fourth Amended Complaint. Defendant Caron was the Executive Director of the Board.[2] Defendant Bivins was the Assistant Attorney General who advised the Board. Defendant O'Donohue is the individual who was retained by the Board to evaluate Plaintiff and to administer the test at issue. Defendants have each moved separately for summary judgment on Plaintiff's claims against them under 42 U.S.C. § 1983 and the analogous provision of the Maine Civil Rights Act, 5 M.R.S.A. § 4682, arguing that he or she is entitled to absolute immunity or, in the alternative, qualified immunity. The Defendants

also challenge Plaintiff's claim for punitive damages. In addition, Defendant O'Donohue contends that Plaintiff is required to comply with the terms of the Maine Health Security Act, 24 M.R.S.A. § 2501 *et seq.*, in order to proceed with his negligence claim and that his failure to provide notice of claim as required by section 2903 of the Act, as well as the Act's statute of limitations, section 2902, bar this claim.

The Court referred the case to Magistrate Judge Cohen for a recommended decision on the summary judgment motions. In his Recommended Decision (Docket No. 82) Judge Cohen concluded that the Defendants are entitled to absolute immunity under federal and state law for their actions in this case. In addition, Judge Cohen recommended that Defendant O'Donohue was entitled to summary judgment on Plaintiff's negligence claim because the applicable statute of limitation had expired. The matter is now before the Court for review of the Recommended Decision on the objections thereto.

*I. FACTS*

The facts viewed in the light most favorable to Plaintiff are as follows: At all times relevant to this proceeding, Plaintiff was licensed by the Board to practice nursing in Maine. Plaintiff's Statement of Material Facts in Opposition to Defendants' Motions for Summary Judgment (Docket No. 78), Affidavit of Norman L. Berthiaume, Ex. A ¶ 2. In January 1990, the United States Attorney charged Plaintiff with a violation of federal law involving receipt through the mail of a videotape allegedly containing child pornography. *Id.* ¶ 3. Plaintiff notified the Board of the charges against him prior to their disposition. *Id.* ¶ 4. Sometime in late spring or early summer 1990, Plaintiff submitted to the Board an application for renewal of his nursing license. *Id.* ¶ 5. In July 1990, Plaintiff entered a guilty plea to the criminal charge of violating 18 U.S.C. § 1462, prohibiting the importation of obscene matter. *Id.*

---

1. The Court has granted the Motion for Summary Judgment filed by the five other named Defendants, all members of the Maine Board of Nursing. Memorandum and Order Granting Summary Judgment (Docket No. 41).

2. As Executive Director of the Maine State Board of Nursing, Ms. Caron has no voting power with respect to Board decisions. Defendant Jean Caron's Statement of Uncontroverted Facts (Docket No. 70) ¶ 42.

¶ 6. Plaintiff received a sentence of two years' probation and a fine of $2,000. *Id.* ¶ 6; Deposition of James D. Bivins, Ex. 5. As a condition of his probation, Plaintiff was required to submit to psychological counseling. Berthiaume Aff. ¶ 7; Bivins Dep., Ex. 5.

In September 1990, Defendant Caron notified Plaintiff that an informal conference with the Board was scheduled for November 8, 1990.[3] Berthiaume Aff. ¶ 9. Plaintiff and his counsel were present at the November 8, 1990, informal conference. Deposition of Robert E. Hirshon, Ex. 1 at 2. The Board conducted the conference in executive session, after which the panel made the following findings of fact on the record:

a. Licensee states that this was an isolated incident. The U.S. District Judge who sentenced Mr. Berthiaume apparently agreed.

b. Licensee voluntarily began and continues in psychological counseling.

c. Court documents indicate there is no prior history of any same or similar acts by Licensee.

d. Licensee has a good work history.

e. [The sentencing judge] stated "I really get very clearly the picture there is no indication whatever of this person being involved in the abuse of children sexually or otherwise."

f. Licensee has voluntarily restricted his practice to adults, pending final resolution of this matter.

g. Licensee has plead guilty to importation of obscene matter in violation of Title 18, United States Code, Section 1462. Licensee was sentenced to two years probation, a $2,000 fine and was ordered to submit to counseling.

h. Many letters of support have been submitted to the Board on behalf of Licensee.

i. Dr. Roger Ginn, a psychologist, evaluated Licensee and concluded that psychological testing did not point to any significant psychological or emotional problems which would adversely affect his

functioning or suggest that he is at any risk at all to anyone in the community. Statement of Material Facts in Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher (Docket No. 16), Ex. 5 at 2–3. The Board, however, adjourned the informal conference without voting on the renewal of his license, in order for Plaintiff to obtain "an independent [psychological] evaluation."[4] Berthiaume Aff. ¶ 13; Statement of Material Facts in Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher, Ex. 5 at 3. Pending the outcome of the independent psychological examination, the Board placed Plaintiff's license on probation and limited his practice to patients 18 years of age or older, a limitation that Plaintiff had already undertaken voluntarily, Statement of Material Facts in Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher, Ex. 5 at 3.

Subsequent to the November 8 meeting, Defendant Bivins, the Assistant Attorney General advising the Board, contacted two psychologists, one of whom recommended Defendant O'Donohue, a member of the faculty at the University of Maine at Orono. Bivins Deposition at 43–45; Deposition of William O'Donohue at 41. Defendant Caron contacted Defendant O'Donohue about conducting an examination of Plaintiff. Deposition of Jean C. Caron at 84–85. O'Donohue told Caron and Bivins that a penile plethysmograph was among the tests he considered appropriate for Plaintiff and he gave them a

---

3. Defendant Caron also sent a letter dated October 2, 1990, to Plaintiff's counsel, Robert Hirshon, notifying him that the informal conference had been scheduled for November. Statement of Material Facts in Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher (Docket No. 16) Ex. 5 at 2–3.

4. In July and August of 1990, Plaintiff was evaluated and tested by a clinical psychologist, Dr. Roger Ginn. Dr. Ginn concluded in his written report that there was "nothing in [his] evaluation which would suggest that Plaintiff should not continue to [practice nursing]." Plaintiff's Statement of Material Facts in Opposition to Defendants' Motions for Summary Judgment (Docket No. 78), Ex. Al, Report of Roger Ginn, Ph.D.

basic explanation of the penile plethysmograph, including that it involved a device attached to the subject's penis and showing the subject slides and playing audio tapes involving child sexual activity. Caron Dep. at 87; Bivins Dep. at 42–48. Following this discussion, Caron consulted with Bivins and thereafter with Clark, who was then serving as Chair of the Board. Caron Dep. at 89–90. Clark directed Caron to retain O'Donohue to perform the examination. Caron Dep. at 98; Deposition of Betty B. Clark at 31. Clark knew that O'Donohue planned to use the plethysmograph test before she gave this direction to Caron. Clark Dep. at 31; Caron Dep. at 93–95.

The Board did not inform Plaintiff at the informal conference that the penile plethysmograph would be included in the psychological evaluation. Berthiaume Aff. ¶ 14; Statement of Material Facts in Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher, Ex. 5 at 3. Caron left the matter of arranging the examination to Bivins. Caron Dep. at 98–99, Bivins Dep. at 42–43. In mid–November of 1990, Defendant Bivins notified Plaintiff's counsel that O'Donohue would perform the psychological examination and that the examination would include a penile plethysmograph test. Berthiaume Aff. ¶ 15.; Bivins Dep. at 61. Plaintiff was told that if he did not take the test, the Board would seek revocation of his nursing license. Id. ¶ 15. Although Plaintiff expressed reservations about the test, he eventually agreed to it. Berthiaume Aff. ¶¶ 16–17. Defendants Caron and Bivins were aware of these reservations by or soon after November 21, 1990. Caron Dep. at 101; Hirshon Dep., Exs. 14 & 65.

Dr. O'Donohue administered the penile plethysmograph examination to Plaintiff on November 29 and December 6, 1990. Berthiaume Aff. ¶ 18. An assistant placed Plaintiff in a windowless room that contained a projector and an intercom. Id. ¶ 19. Plaintiff was given a U-shaped strain gauge and was told to remove his pants and underwear, to sit in a recliner chair, and to attach the gauge to his penis. Id. The first part of the test consisted of showing Plaintiff thirty slides containing scenes of naked women, homosexual activity, heterosexual activity, and naked children. Id. ¶ 20. After the slide was presented for ninety seconds, Plaintiff was required to describe into the intercom the scene depicted on the slide. Id. ¶ 21. Thereafter, Plaintiff was required to sit in total darkness for one and one-half minutes. Id. ¶ 22. The second part of the test required Plaintiff, sitting in total darkness, to listen to thirty different ninety-second "scenes" played over the intercom. Id. ¶ 23. These audio scenes were "very graphic and explicit in detail" and included descriptions of homosexual activity, adult sexual activity with children, violent sexual activity, and the beating of children. Id. ¶ 23. Plaintiff describes the penile plethysmograph test as "extremely invasive ... shocking, humiliating, degrading and traumatizing." Id. ¶ 24.

On December 13, 1990, the Board voted to renew Plaintiff's nursing license on a probationary status for two years. Caron Dep., Ex. 22, Draft Minutes of Maine State Board of Nursing. Plaintiff was placed on probation on condition that he receive independent psychological evaluation and counseling at his own expense, that he limit his practice to patients 18 years of age and older, and that he disclose the contents of his consent agreement with the Board to his employers or supervisors. Berthiaume Dep., Ex 25 at 3. On February 8, 1991, Plaintiff entered into a consent agreement with the Board reflecting these and other conditions. Id.

## II. ANALYSIS

Summary judgment has a special niche in civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993) Summary judgment is appropriate in the absence of a genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). The Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines. Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

### A. Federal Civil Rights Claims

Plaintiff correctly points out that there are only two ways to initiate disciplinary proceedings against a licensee under the applicable Maine law: either by the Board introducing a complaint "on its own motion" or "upon receipt of a written complaint filed with the Board." 32 M.R.S.A. § 2105–A(1–A). Under the statute, a complaint is the predicate for an informal conference.[5] The record in this case does not include a written complaint to or by the Board. The statute, however, does not require that a complaint by the Board be in writing, only that a complaint filed by someone other than the Board needs to be in writing.

■ Plaintiff erroneously argues throughout his brief that no complaint was ever filed against him resulting in the initiation of a disciplinary action by the Board. Plaintiff characterizes the Board's interest in meeting with him on November 8, 1990, as concern "about [his] guilty plea to a charge of importing an obscene videotape and asked Plaintiff to meet with them in an informal conference to discuss the matter." Plaintiff's Objection to Recommended Decision on Motions for Summary Judgment and Memorandum of Law in Support Thereof (Docket No. 84) at 4. Plaintiff's argument assumes that because he approached the Board with the information about the criminal charges pending against him, the Board could not, or did not, thereafter initiate a complaint on its own motion. The record in this case discloses otherwise.

Although the record does not include a written complaint from the Board, it is unnecessary under the statute. The Board sent Plaintiff a "Notice of Informal Conference" dated October 2, 1990, confirming the November 8, 1990, informal conference regarding his license renewal. Statement of Material Facts In Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher, Ex. 2. Included with the notice letter was a "Waiver of Objections" form. *Id.* Prior to attending the November informal conference, Plaintiff signed the waiver form which clearly states that a "complaint" has been made and that the "informal conference is to determine whether the factual basis of the complaint may be true." *Id.* at Ex. 3. Moreover, the Board's minutes reflect that a complaint, initiated by the Board, was pending against Plaintiff. *Id.* at Ex. 5. The Court therefore concludes that a complaint, which initiated disciplinary action by the Board under the statute, was pending against Plaintiff and

---

5. At the time of the disciplinary action against Plaintiff 32 M.R.S.A. § 2105–A provided, in pertinent part:

**1–A. Disciplinary proceedings and sanctions.** The Board shall investigate a complaint on its own motion or upon receipt of a written complaint filed with the board, regarding noncompliance with or violation of this chapter or of any rules adopted by the board. Investigation may include a hearing before the board to determine whether grounds exist for suspension, revocation or denial of a license, or as otherwise deemed necessary to the fulfillment of its responsibilities under this chapter. The board may subpoena witnesses, records and documents, including records and documents maintained by a health care facility, in any investigation or hearing it conducts.

The board shall notify the licensee of the content of a complaint filed against the licensee as soon as possible, but in no event later than within 60 days of receipt of this information. The licensee shall respond within 30 days. If the licensee's response to the complaint satisfies the board that the complaint does not merit further investigation or action, the matter may be dismissed, with notice of the dismissal to the complainant, if any.

If, in the opinion of the board, the factual basis of the complaint is or may be true, and it is of sufficient gravity to warrant further action, the board may request an informal conference with the licensee. The board shall provide the licensee with adequate notice of the conference and the issues to be discussed. The conference shall be conducted in executive session of the board, unless otherwise requested by the licensee. Statements made at the conference may not be introduced at a subsequent formal hearing unless the parties consent.

Former § 2105–A (1–A) (repealed and replaced by P.L.1993, ch. 600, § A–116).

that Plaintiff was aware of the complaint at the time of the informal conference.

■ Plaintiff also contends that he did not have an opportunity to respond to the complaint. Although the statute provides a licensee thirty days in which to respond to a complaint, it does not contemplate the initiation of a complaint by the Board on information received directly from a licensee. In this case, the complaint was based upon information that Plaintiff himself provided to the Board, eliminating the need for the Board to notify Plaintiff of the content of the complaint. Plaintiff knew at least as much as the Board knew prior to the informal conference. Plaintiff does not suggest that he was not aware of the content of the complaint: in fact, he was the one who volunteered the information to the Board. Plaintiff simply states that he did not have notice of the complaint. The statute does not provide for any determinate period of time for a licensee to respond under these circumstances. Nevertheless, the Court finds that Plaintiff did have a reasonable opportunity— approximately thirty days from the Notice of Informal Conference sent to Plaintiff's counsel on October 2, 1990, until the November 8, 1990, informal conference—to provide the Board with any information he thought would be germane to the informal conference.

### 1. Absolute Immunity

■ The parties vigorously disagree on the Defendants' entitlement to quasi-judicial absolute immunity. Absolute immunity from section 1983 liability is enjoyed by only a "very limited class of officials ... 'whose special functions or constitutional status requires complete protection from suit.'" *Hafer v. Melo*, 502 U.S. 21, 29, 112 S.Ct. 358, 364, 116 L.Ed.2d 301 (1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982)). Such immunity depends not on an official's title but on whether the alleged conduct which gives rise to the complaint involved the performance of a judicial or quasi-judicial function. *Imbler*

*v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *Butz v. Economou*, 438 U.S. 478, 508, 511, 98 S.Ct. 2894, 2911, 2913, 57 L.Ed.2d 895 (1978).

This case does not arise in the context of a criminal proceeding, where the judge and prosecutor have clearly delineated and limited roles. In disciplinary actions under 32 M.R.S.A. § 2105–A, the Board of Nursing is authorized to perform as investigator, prosecutor, and adjudicator. The amalgamation of these three functions in one body complicates the analysis of Defendants' immunity claims. Although, as the Magistrate Judge correctly concluded, the "informal conference was the first step in the adjudicative process," everything that followed the informal conference was not necessarily adjudicative in nature. Recommended Decision (Docket No. 82) at 14. The principal factual question here is how were the Board members functioning *at the time they made the decision to go forward with the O'Donohue evaluation which included a penile plethysmograph test. See Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547 (1991) ("[T]he official seeking absolute immunity bears the burden of showing that such, immunity is justified for the function in question."). It is not whether the Board *ever* functions in an adjudicatory capacity.

■ Here, subsequent to the informal conference of November 8, during communications totally separate from any Board meeting, proceeding, or informal conference, Defendants decided Plaintiff should take the penile plethysmograph test. This decision was not made by the Board but, rather, by individual Board members and counsel advising the Board. This leads the Court to conclude that the decision was made separate and apart from the Board's quasi-judicial functions. The Board members and their advising attorney were not involved in the adjudicative process after the full Board had adjourned the informal conference requesting what appeared to be a routine psychiatric evaluation.[6]

---

6. At the informal conference, the Board did not indicate that a penile plethysmograph would be part of the psychiatric evaluation. Berthiaume Aff. ¶ 14; Statement of Material Facts In Support of Motion for Summary Judgment by Defendants Murray, Twombly, Vampatella, Pray, and Fisher, Ex. 5 at 3.

■ The next inquiry is whether these Board members were acting in a prosecutorial role that was intimately associated with the quasi-judicial process at the time they made the decision to go forward with the O'Donohue evaluation which included a penile plethysmograph test. If a prosecutor is performing what is considered a traditional prosecutorial function, he is entitled to absolute immunity. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 270–71, 113 S.Ct. 2606, 2614, 125 L.Ed.2d 209 (1993) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976)) (Prosecutors are entitled to absolute immunity for actions which are " 'intimately associated with the judicial phase of the criminal process.' "). A prosecutor engaged in purely investigative activities enjoys not the absolute immunity available in the judicial process, but only a good-faith defense comparable to that of a law enforcement officer. Here, Defendants were involved in an investigative function which is entitled only to an immunity based on good faith. *See e.g., Burns,* 500 U.S. at 495, 111 S.Ct. at 1944; *Houston v. Partee,* 978 F.2d 362, 365–68 (7th Cir.1992); *Kulwicki v. Dawson,* 969 F.2d 1454, 1465–66 (3rd Cir.1992).

Defendants rely on *Wang v. New Hampshire Board of Registration in Medicine,* 55 F.3d 698 (1st Cir.1995), and *Bettencourt v. Board of Registration in Medicine,* 904 F.2d 772 (1st Cir.1990), to support their asserted entitlement to absolute immunity. *Wang* and *Bettencourt* are both distinguishable. The actions of the Boards in *Wang* and *Bettencourt* were limited to initiation of administrative proceedings and adjudication of entitlement to medical licenses—those Boards were involved in no investigation.[7] The Court does not find either of these cases helpful because neither addresses the question of fact presented in this case: that is, did the actors engage in functions which may be characterized as quasi-judicial or traditionally prosecutorial in nature.

In *Wang* the First Circuit explained that "[s]tate officials performing prosecutorial functions—including their decisions to initiate administrative proceedings aimed at legal sanctions—are entitled to absolute immunity." *Wang,* 55 F.3d at 701. Defendants overstate the holding in *Wang,* asserting that the court held that an individual has absolute immunity for all prosecutorial functions. Although Wang argued that the New Hampshire Board assumed an "inquisitorial or investigative role," this argument was apparently based only on the Board's instigation of administrative proceedings and prosecution of charges against him rather than on any investigative evidence–gathering the Board conducted. *Id.* at 701. In contrast, the Board members' actions in this case went beyond simply bringing and prosecuting the complaint against Plaintiff, by requiring that he take a penile plethysmograph test.

*Bettencourt* is additionally distinguishable and is necessarily limited to board members' actions in their adjudicatory capacities. *Bettencourt,* 904 F.2d 772, 783–84. In *Bettencourt,* Plaintiff did not challenge the district court's finding that, "while engaging in the activities criticized herein, the Board members and their staff were acting in their 'quasi-judicial', *i.e.,* adjudicatory capacity." *Id.* at 782. Rather, plaintiff argued, that "as a matter of public policy, members of a state medical board (and their staff) when fulfilling a quasi-judicial role should not be granted absolute immunity from damages suits." *Id.* The *Bettencourt* Court, therefore, did not address the question presented in this case.

In *Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), a case involving a prosecutor's claim of absolute immunity, the Supreme Court closely scrutinized the nature of the prosecutor's action in performing investigatory functions. There the Court was deciding whether the prosecutors were functioning as advocates when they were endeavoring to determine whether a bootprint at the scene of the crime had been made by the petitioner's foot. The prosecutors did not have probable cause to arrest

---

7. The facts in *Wang* do not detail what role the Board played in the process; the Court simply concluded that there was "no material distinction between the quasi-judicial and prosecutorial functions performed by these defendants in behalf of the New Hampshire Board, and those performed by their Massachusetts counterparts" in *Bettencourt. Wang,* 55 F.3d at 701.

the petitioner or to initiate judicial proceedings during that period of time. Finding that the defendant prosecutors were carrying out *investigatory* functions only, the Supreme Court rejected their defense of absolute immunity. The Court's detailed analysis sheds light on where the lines are drawn with regard to Defendants' functions herein:

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in *searching for* the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate, nor justifiable, that, for the same act, immunity should protect the one and not the other.'

*Id.*, 509 U.S. at 273, 113 S.Ct. at 2616, 125 L.Ed.2d at 226–27 (citations omitted).

Similarly, *Guzman–Rivera v. Rivera–Cruz*, 55 F.3d 26 (1st Cir.1995), is instructive on the distinction between a prosecutor's investigative and quasi-judicial functions for immunity purposes. In *Guzman–Rivera*, the plaintiff was convicted of murder and imprisoned. After sentencing, plaintiff's father began meeting with defendant Secretary of Justice and officials of the Justice Department's Civil Rights Division, presenting evidence to such officials that his son was innocent. After many months, the Justice Department and Civil Rights Division finally investigated plaintiff's case and concluded that he was innocent. Defendant Director of the Justice Department, however, refused to move for plaintiff's release until the actual murderer was captured. Plaintiff was released only after plaintiff's father turned to the media to publicize his son's plight.

Plaintiff in *Guzman–Rivera* initiated a section 1983 lawsuit against defendants, alleging that they failed to timely reinvestigate the facts of the murder after his conviction and that they failed to move for his release after the investigation had established his innocence. Defendants moved for summary judgment on absolute immunity grounds.

The district court denied the motion and defendants appealed. In analyzing plaintiff's claims regarding the reinvestigation of the murder, the Court of Appeals for the First Circuit applied the functional analysis required with absolute immunity claims. The court stated:

> The defendants seem to think that absolute immunity extends to all conduct that facilitates the prosecutorial function. The functional analysis, however, requires us to draw a line between the preparatory conduct that is merely administrative or investigative, and that which is itself prosecutorial. For example, some, but not all, of the prosecutor's preparatory acts in initiating a prosecution and presenting the State's case are absolutely immune. The prosecutorial nature of an act is not spread backwards like an inkblot, immunizing everything it touches.

*Id.* at 29 (citations omitted). The Court of Appeals' analysis and holding in *Guzman–Rivera*, denying absolute immunity regarding the investigation claims, applies to this action.

> This case mirrors *Buckley* in the post-trial context. It is undisputed on appeal that no postconviction proceeding was pending at the time of the civil rights investigation. Although the investigation ultimately gave the defendants cause to move to reopen the criminal proceedings—*i.e.*, to resume their role as 'advocate[s] for the [Commonwealth],'—this was only one of several possible outcomes ... Accordingly, the civil rights investigation had only an attenuated and contingent, as opposed to 'intimate[ ],' association with the judicial phase of the criminal process.

*Id.* at 30 (quoting *Imbler*, 424 U.S. at 431 n. 33 & 430, 96 S.Ct. at 996 n. 33 & 994–95).

While the Board in this case had a complaint pending before it, no adjudicatory proceeding was currently convened when Plaintiff was required to take the penile plethysmograph test. Quasi-judicial proceedings have flexibility to adjourn for information gathering or other reasons, unlike pure judicial proceedings which proceed without interruption once instituted. Although a complaint was pending in this case,

the Board's adjournment attenuated the request that Plaintiff take the penile plethysmograph test from the judicial portion of the disciplinary action. With this procedural backdrop, the Court can see no significant distinction between the instant case and *Guzman–Rivera* or *Buckley.*

Prior to the request that Plaintiff obtain an independent psychological examination, the Board had collected some evidence through the informal conference process. Nevertheless, it apparently wanted more information regarding Plaintiff's fitness for licensure. All of the actions of Defendants Clark, Caron, and Bivins upon which Plaintiff's claims are based took place *before* Plaintiff underwent the penile plethysmograph. By requiring that Plaintiff submit to the penile plethysmograph examination, Defendants Clark, Caron, and Bivins were not adjudicating an issue; nor were they acting collectively as an advocate making a decision to initiate a proceeding. Moreover, the Board members and counsel were not evaluating evidence and preparing for presentation of the evidence to an adjudicatory body when, at the time that they required Plaintiff to undergo the examination, the evidence was yet to be collected from Plaintiff. The Board members were acting in a detective's role in searching for clues making their actions preparatory to that of the judicial or traditional prosecutorial function. The actions of Defendants Clark, Caron, and Bivins are analogous to "[m]erely investigative evidence-gathering [which] is not absolutely protected." *Kulwicki,* 969 F.2d at 1465. Accordingly, the Court will deny Defendants Clark, Caron, and Bivins' motions for summary judgment on absolute immunity grounds. The Court will also deny Defendant O'Donohue's claim for absolute immunity which derives from that of the Board members.

### 2. Qualified Immunity

If Defendants' conduct is immunized at all, it results from the qualified good faith immunity available under 42 U.S.C. § 1983. Government officials are entitled to qualified immunity for their discretionary acts as long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

The existence of factual issues to be tried involving the use of the penile plethysmograph has already been decided by the Court of Appeals for the First Circuit. In *Harrington v. Almy,* 977 F.2d 37, 44 (1st Cir.1992), the First Circuit acknowledged that factual issues are presented by the State's requirement that an individual submit to the penile plethysmograph. *Id.* at 44 ("A reasonable finder of fact could conclude that requiring the plethysmograph involves a due process violation."). The *Harrington* Court emphasized that the parties asserting qualified immunity have the burden of showing "the procedure's reliability and, in light of other psychological evaluative tools available, . . . that other less intrusive means of obtaining the relevant information are not sufficient." *Id.* Some of the same factual issues are presented in this case. These issues include, *inter alia:* (1) whether Defendants acted reasonably in failing to consider alternative approaches to meeting the Board's need for additional information without requiring Plaintiff to take the penile plethysmograph test; (2) whether the test was shocking, degrading, and humiliating and, if so, whether Defendants acted reasonably in failing to consider the impact of the procedure on Plaintiff; (3) whether the penile plethysmograph was scientifically capable of meeting the legitimate state interest in this case; and (4) whether the extent of Defendants' inquiry into the scientific validity of the penile plethysmograph was reasonable in light of the intrusiveness and invasiveness of the test. Accordingly, the Court will deny Defendants Clark, Caron, and Bivins' motions for summary judgment on qualified immunity grounds. Here again, Defendant O'Donohue's claim to qualified immunity will be denied since it flows from that of the Defendant Board members.

### B. Maine Civil Rights Act

The Maine Civil Rights Act ("MCRA") "was designed to prevent intentional interference with the exercise of rights secured by the laws and constitutions of ei-

ther the United States or Maine by threats, intimidation, or coercion." *Phelps v. President and Trustees of Colby College*, 595 A.2d 403, 404 (Me.1991). Patterned after 42 U.S.C. § 1983, the MCRA provides a general remedy for violations of federal and state constitutional and statutory rights. *LaPlante v. United Parcel Service, Inc.*, 810 F.Supp. 19, 22 (D.Me.1993). Although the Maine Law Court has not yet addressed the issue, the Court will apply the absolute immunity analysis set forth above to Plaintiff's claims under the MCRA. *See Jenness v. Nickerson*, 637 A.2d 1152, 1158 (Me.1994) (quoting *Grenier v. Kennebec County, Maine*, 733 F.Supp. 455, 458 n. 6 (D.Me. 1990)) ("The MCRA 'was patterned after 42 U.S.C. § 1983.'"). Thus, the analysis under parallel federal law requires the Court to conclude that absolute immunity is not available to Defendants under the MCRA. The Law Court has, however, decided that the same qualified immunity analysis discussed above under federal law applies to Plaintiff's claims under the MCRA. *Jenness*, 637 A.2d at 1159; *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 n. 3 (1st Cir.1995). Likewise, therefore, the Court finds that there are material issues of fact on qualified immunity which prevent summary judgment on the MCRA claim at this time.

*C. Negligence Claim Against O'Donohue*

The Court will affirm the Recommended Decision of the Magistrate Judge on Count III, in which he recommended the Court grant Defendant O'Donohue's motion for summary judgment on Plaintiff's negligence claim on statute of limitation grounds.

*D. Punitive Damages*

 Punitive damages against individuals are available in a section 1983 action only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Under Maine law, punitive damages are available only upon a showing of express or implied malice. *Tuttle v. Raymond*, 494 A.2d 1353,

1361 (Me.1985). Implied malice can be shown by conduct "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Id.* The Court concludes that there are issues of fact regarding punitive damages in the instant case which prevent disposition of this claim on summary judgment.

The Court declines to accept the decision of Magistrate Judge Cohen on Counts I, II, and IV. It is *ORDERED* that Defendants Clark, Caron, Bivins, and O'Donohue's Motions for Summary Judgment (Docket Nos. 66, 69, 71 & 73) be, and they are hereby, *DENIED* on Counts I, II, and IV. The Court accepts the recommended decision of Magistrate Judge Cohen on Count III. It is *ORDERED* that Defendant O'Donohue's Motion for Summary Judgment (Docket No. 66) on Count III be, and it is hereby, *GRANTED.*